**Electronically Filed
Supreme Court
SCWC-11-0000625
23-DEC-2013
11:01 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

SIERRA CLUB, Petitioner/Appellant-Appellee,

vs.

CASTLE & COOKE HOMES HAWAI'I, INC.; and
THE LAND USE COMMISSION OF THE STATE OF HAWAI'I,
Respondents/Appellees-Appellants,

and

OFFICE OF PLANNING, STATE OF HAWAI'I; DEPARTMENT OF PLANNING AND
PERMITTING; and NEIGHBORHOOD BOARD NO. 25,
Respondents/Appellees-Appellees.

SCWC-11-0000625

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-11-0000625[1];  CIV. NO. 10-1-2424-11)

December 23, 2013

NAKAYAMA, ACOBA, McKENNA, AND POLLACK, JJ., WITH
RECKTENWALD, C.J., CONCURRING AND DISSENTING SEPARATELY

---

[1]     CAAP-11-0000627, CAAP-11-0000730, and CAAP-11-0000744 were consolidated with CAAP-11-0000625 on November 16, 2011.

OPINION OF THE COURT BY POLLACK, J.

This case requires us to consider whether the Hawaiʻi State Senate's express rejection of a board member's nomination for a second term effectively disqualifies the member from continuing to serve on the board and from voting on matters of critical importance to the community.

On April 26, 2010, the Senate rejected Duane Kanuha's (Kanuha) nomination for a second term as a commissioner on the Respondent/Appellee-Appellant state Land Use Commission (LUC), based in part on the finding that Kanuha lacked the requisite knowledge and experience to qualify as the designated member with expertise on Hawaiian land usage. More than four months after the Senate's rejection, Kanuha continued to participate in the LUC's consideration of a significant development project involving the reclassification of agricultural land for urban use. At that time, the Petitioner/Appellant-Appellee Sierra Club (Sierra Club) filed an action to disqualify Kanuha from serving on the LUC as of the date of his rejection and to invalidate any actions Kanuha had taken with respect to the development project. The LUC denied the action and, that same day, deliberated on and voted to approve the subject reclassification. Despite the Senate's finding that he was unqualified to continue serving as an LUC member, Kanuha participated in the LUC's vote and the LUC's subsequent vote to approve the written findings, conclusions, and decision and order approving the project. The

-2-

decision and order would not have been approved without Kanuha's vote.

For the reasons set forth herein, we conclude that in light of the Senate's rejection of Kanuha's nomination for a second term, Kanuha was not a valid holdover member of the LUC under Hawai'i Revised Statutes (HRS) § 26-34 when he voted on the reclassification. Kanuha also did not qualify as a de facto member of the LUC given the Senate's express rejection of his nomination. Without Kanuha's disqualified vote, the LUC lacked the requisite number of votes to approve the reclassification. Accordingly, we reverse the judgment of the Intermediate Court of Appeals (ICA) and affirm the judgment of the Circuit Court of the First Circuit (circuit court).

I.

Kanuha was nominated by the governor for a four-year term as a LUC commissioner on April 12, 2005. 2005 Senate Journal, at 586 (Governor's Message 630). His nomination was confirmed by the Senate on April 27, 2005. 2005 Senate Journal, at 770.

On July 3, 2007, Respondent/Appellee-Appellant Castle & Cooke Homes Hawai'i, Inc. (Castle & Cooke) filed a Petition for Land Use District Boundary Amendment with the LUC. Subsequently on May 16, 2008, Castle & Cooke filed an Amended Petition for Land Use District Boundary Amendment Verification

(Reclassification Petition),[2] seeking to amend the land use district boundary to reclassify approximately 767 acres in Waipiʻo and Waiawa, Oʻahu, from an agricultural to urban district. The petition involved two geographic areas referred to as Koa Ridge Makai, consisting of approximately 576.435 acres of land in Waipio, and Castle & Cooke Waiawa, consisting of approximately 191.214 acres of land in Waiawa.

The petition was filed pursuant to HRS § 205-4 (governing district boundary amendments to land areas greater than fifteen acres) and Hawaiʻi Administrative Rules (HAR) § 15-15 (governing LUC rules). The boundary amendment and reclassification was requested as part of a proposal for the two-phase development of 5,000 residential units, mixed-use village center, hotel, medical center, commercial properties, light industrial, elementary schools, parks, churches, recreation centers, open space, and roadways. The development was expected to span more than ten years, with Koa Ridge Makai projected to be completed by 2020 and Castle & Cooke Waiawa projected to be completed by 2024.

The LUC held several evidentiary hearings on the Reclassification Petition, during which it received numerous oral and written testimonies from the public, both in support of and in opposition to the Project.

---

[2]    The Reclassification Petition included three amendments to the petition submitted by Castle & Cooke on June 17, June 30, and November 2, 2009.

-4-

While the LUC was still in the process of considering the Reclassification Petition, Kanuha's first term expired on June 30, 2009. See 2005 Senate Journal, at 586 (Governor's Message 630). He continued to serve as a LUC commissioner as a holdover member.

On December 4, 2009, the LUC voted to approve the Sierra Club's petition to intervene in the matter.[3]

On March 3, 2010, the governor nominated Kanuha to serve a second term as a LUC commissioner. 2010 Senate Journal, at 283 (Governor's Message 338). The Water, Land, Agriculture, and Hawaiian Affairs committee prepared a report on Kanuha's nomination. S. Stand. Comm. Rep. No. 3208, 2010 Senate Journal, at 1332. The committee stated that Kanuha "is presently a member of the [LUC], and is the designated member with substantial experience or expertise in traditional Hawaiian land usage and knowledge of cultural practices."[4] Id. However, the committee found that Kanuha had "limited experience with traditional Hawaiian land usage and knowledge." Id.

_____

[3] The LUC also voted to allow the Mililani/Waipio/Melemanu Neighborhood Board No. 25 (Neighborhood Board No. 25) to intervene in the matter.

[4] In 2006, after Kanuha was appointed for his first term, HRS § 205-1 was amended to require that one member of the LUC "shall have substantial experience or expertise in traditional Hawaiian land usage and knowledge of cultural land practices." 2006 Haw. Sess. Laws Act 296, § 1 at 1198. During the Senate's floor discussion of Kanuha's nomination for a second term, there was disagreement as to whether Kanuha was currently serving as, or being nominated to serve as, the designated member with cultural expertise. See 2010 Senate Journal, at 561-64. Kanuha's position was that he was not aware that he was currently serving as, or being nominated to serve as, the designated member. See id.

The committee further noted that it had been referred a total of four nominees to the LUC during the 2010 regular session, consisting of three current LUC commissioners and a fourth nominee, a "civil litigation attorney with no experience in land issues." Id.

Despite its concerns, the committee recommended that the Senate consent to Kanuha's nomination. Id.

On April 26, 2010, the full Senate considered Kanuha's nomination for a second term. 2010 Senate Journal, at 564. During the floor discussion on Kanuha's nomination, Senators Hee and Hemmings spoke in opposition to the nomination, citing Kanuha's lack of expertise as a cultural practitioner. 2010 Senate Journal, at 561-64. Senator Hemmings in particular argued that the Senate had "no choice" but to reject Kanuha's nomination in order to comply with HRS § 205-1, which requires one member of the LUC to have "substantial experience or expertise in traditional Hawaiian land usage and knowledge of cultural land practices":

> Through it all in all of the discussion, one clear factor cannot be denied: We passed a law requiring a cultural practitioner. The Governor has not followed it. This nominee, by his own admission, is not a cultural practitioner. We have no choice but to vote 'no' in order to stay compliant with the law as it is written and, more importantly, with the moral integrity of this body to stay consistent with what we voted for.

2010 Senate Journal, at 564 (emphasis added).

After completion of the floor discussion, the Senate voted to reject Kanuha's nomination by a vote of 14-9, with two Senators excused.  Id.

More than four months after the Senate's vote to reject his nomination for a second term, Kanuha continued to participate in the LUC's consideration of the Reclassification Petition.  On September 8, 2010, the Sierra Club filed a Motion to Disqualify Duane Kanuha, Nunc Pro Tunc, as of April 26, 2010 (Motion to Disqualify) with the LUC.[5]  The Sierra Club argued that Kanuha's capacity to be a holdover member under HRS § 26-34 was terminated on April 26, when the Senate declined to confirm his nomination for re-appointment.  The Sierra Club requested that the LUC issue an order providing that Kanuha was not a commissioner as of April 26, 2010, and that any actions taken by Kanuha with respect to the Reclassification Petition since that time be deemed invalid.

The LUC convened for a meeting on September 23, 2010, to consider the Motion to Disqualify and the Reclassification Petition.  The LUC voted 6-0 to deny the Motion to Disqualify, with Kanuha and one other commissioner abstaining from voting. Prior to voting on the Reclassification Petition, the LUC Chairman informed the commissioners that if a decision was

---

[5]     The motion was filed pursuant to HAR § 15-15-70, which provides that "[a]ny party may make motions before, during, or after the close of a hearing."  HAR § 15-15-70(a).  Castle & Cooke filed a memorandum in opposition to the motion, arguing that the incumbent LUC commissioner retains the right to hold office until a successor is appointed and qualified.  The state Office of Planning filed a joinder in Castle & Cooke's memorandum in opposition.

reached that day, the LUC staff would be directed to draft findings of fact, conclusions of law, and a decision and order reflecting the decision. Those findings and conclusions would "be further deliberated" at the next hearing. The LUC then voted to approve the Reclassification Petition by a vote of 7-1, with Kanuha voting in favor of approval and one commissioner being excused.

The LUC convened again on October 15, 2010 to deliberate on the proposed "Findings of Fact, Conclusions of Law, Decision and Order" (Decision and Order) prepared by the staff following the prior meeting. The commissioners proposed and deliberated on multiple amendments to the conditions in the proposed order.[6] The LUC, including Kanuha, voted 6-0 to approve the Decision and Order, as amended by the discussion during the meeting.

The Sierra Club filed an appeal with the circuit court on November 10, 2010, challenging the Decision and Order. The Sierra Club argued that Kanuha's capacity to continue serving as a commissioner was terminated by the Senate's rejection of his

---

[6] Commissioner Judge proposed amendments to Condition 3 (integrated solid waste management plan), Condition 8 (civil defense), and Condition 12 (public school facilities). Commissioner Jencks proposed amendments to Condition 13 (archaeological and historic preservation), Condition 14 (previously unidentified burials and archaeological/historic sites), Condition 15 (access rights), Condition 19 (best management practices), and Condition 26 (annual reports). Following an executive session, Commissioner Jencks withdrew his proposed amendments in favor of future discussion. Commissioner Contrades proposed a revision to Condition 16 (compliance with sustainability plan).
Commissioner Lezy proposed a revision to Finding of Fact 277 regarding developing Koa Ridge Makai independently of Castle & Cooke Waiawa.

-8-

nomination for a second term.[7]  Thus, Kanuha should not have been permitted to vote on the Reclassification Petition, and the petition should have been denied because the October 15 LUC vote approving the Decision and Order failed to receive the requisite six affirmative votes.  The Sierra Club asked the circuit court to stay the order granting the amendment of the land use district boundaries and to stay the appellees, including the LUC and Castle & Cooke, from taking further action pursuant to the order.[8]  The Sierra Club also asked the circuit court to reverse the Decision and Order and remand with instructions to the LUC to enter findings of fact, conclusions of law, and a decision and order denying the Reclassification Petition.

In response, the LUC argued that Kanuha was a valid holdover member under HRS § 26-34, as nothing in the statute or its legislative history indicated that the Senate's rejection of an incumbent's nomination for a second term has any effect on the incumbent's status as a holdover member.  Alternatively, the LUC argued that even assuming Kanuha was disqualified from participating in the proceedings on the Reclassification

---

[7]     The Sierra Club specifically alleged that Kanuha's continued participation in LUC proceedings regarding the Reclassification Petition violated article V, section 6 of the Hawaiʻi Constitution (requiring Senate's advice and consent for appointments), HRS § 26-34 (establishing holdover provision), HRS § 205-1 (requiring member with expertise in traditional Hawaiian land usage and requiring six affirmative votes for any boundary amendment), and HAR § 15-15-13 (requiring six affirmative votes for boundary amendments).

[8]     The other named appellees were the state Office of Planning, the city Department of Planning and Permitting, and Neighborhood Board No. 25.

Petition, the petition was still approved by the requisite six affirmative votes on September 23, 2010.  The LUC contended that the subsequent vote to approve the Decision and Order was "an administrative or ministerial act," which only required five affirmative votes pursuant to HRS § 92-15.  Castle & Cooke reiterated many of the same arguments, maintaining that the Reclassification Petition was approved by more than six affirmative votes on September 23 and that Kanuha was a valid holdover under HRS § 26-34.

At the hearing on the appeal, the LUC argued for the first time that the circuit court lacked jurisdiction to review the LUC's approval of the Reclassification Petition because a quo warranto action to remove Kanuha was the exclusive remedy available to Sierra Club.[9]  The court set a briefing schedule with respect to the jurisdiction issue and proceeded to address the merits of the Sierra Club's appeal.

The circuit court held that Kanuha was disqualified from serving as a holdover member as a result of the Senate's

---

[9]    "Quo warranto is 'a common-law writ used to inquire into the authority by which a public office is held or a franchise is claimed.'" Dejetley v. Kahoʻohalahala, 122 Hawaiʻi 251, 265, 226 P.3d 421, 435 (2010) (quoting Black's Law Dictionary 1371 (6th ed. 1991)).  The common law remedy is codified under HRS Chapter 659 and defined by HRS § 659-1 (1993) as "an order issuing in the name of the State by a circuit court and directed to a person who claims or usurps an office of the State or of any subdivision thereof, or of any corporation or quasi-corporation, public or private, or any franchise, inquiring by what authority the person claims the office or franchise."

rejection of his nomination for a second term.[10]  Under HRS § 26-34, "a board member is appointed only after advice and consent of the Senate."  After the Senate rejected Kanuha's nomination, "Kanuha could not be a board member pursuant to 26-34(a), and thus, was disqualified as a holdover member under 26-34(b)":

> Under 26-34(b), a board member may continue office as a holdover member as long as that member is not disqualified from membership under subsection A.  Under 26-34, subsection A, a board member is appointed only after advice and consent of the Senate.  In this particular case, the Senate expressly rejected Mr. Kanuha's appointment for a second term on the LUC.  Accordingly, Mr. Kanuha could not be a board member pursuant to 26-34(a), and thus, was disqualified as a holdover member under 26-34(b).

The court explained, "In essence, the legislative body rejected the continuance of Mr. Kanuha in his executive branch performance of duties, and it would seem contrary to that effect to allow a person who was affirmatively rejected to continue in his position."

The circuit court concluded that because Kanuha was disqualified, the Reclassification Petition did not receive six affirmative votes as required by HRS § 205-4.  The court rejected the argument that the LUC's October 15, 2010 vote approving the Decision and Order was ministerial in nature.  The court reasoned that the LUC "had the ability to not only approve, but also to deny or to modify a petition by imposing further conditions" at the October 15 meeting.  The court noted that pursuant to HRS § 205-4(g), the Commission acts to approve, deny, or modify the petition by filing findings of fact and conclusions of law.

---

[10]    The Honorable Karl K. Sakamoto presided.

-11-

Thus, "it is the actual filing of the actual findings of fact and conclusions of law that constitutes the final LUC action in approving a boundary amendment."

The court therefore concluded "that the ultimate decision to approve the boundary amendment petition took place on October 15th 2010, when the LUC voted to approve the adoption of the findings of fact and conclusions of law before filing." Without Kanuha's disqualified vote, the LUC lacked the six affirmative votes required to approve the boundary amendment. The court held that it would reverse the LUC's Decision and Order approving the Reclassification Petition, subject to briefing on the LUC's jurisdiction argument.

Subsequently on July 29, 2011, the circuit court entered an order denying the LUC's supplemental memorandum on jurisdiction and affirming its reversal of the LUC's Decision and Order.[11]  The court's final judgment was entered on October 5, 2011.

On appeal, the ICA reversed the circuit court's final judgment, holding that Kanuha was not disqualified from serving

---

[11]    The LUC filed a supplemental memorandum on the jurisdiction issue on July 27, 2011.  In the circuit court's order summarily denying the supplemental memorandum, the court noted that the LUC "essentially argues that . . . Kanuha should have been disqualified through a proceeding brought by the State, and that until then, his actions were valid as a de facto officer." However, the court determined that the LUC's quo warranto argument "merely constitute[d] an attack on [Sierra Club's] standing to bring this suit."  The court found that such an "argument was not timely raised in [the LUC's] original briefing," and did not affect the court's jurisdiction over the appeal.
        Castle & Cooke filed a motion for reconsideration of the circuit court's order.  The court denied the motion on August 15, 2011.

as a holdover member under HRS § 26-34(b) as a result of the Senate's rejection of his nomination for a second term.[12]  Sierra Club v. Castle & Cooke Homes Haw., Inc., 128 Hawaiʻi 375, 289 P.3d 1011 (App. 2012).  The ICA determined that pursuant to the plain language of HRS § 26-34(a), "the sole disqualification [from holdover status] is that 'no person shall be appointed consecutively to more than two terms as a member of the same board or commission; provided that membership on any board or commission shall not exceed eight consecutive years.'"  128 Hawaiʻi at 377, 289 P.3d at 1013 (brackets omitted).

The ICA therefore concluded that "Kanuha was not disqualified under HRS § 26-34(a) as he had not been a commissioner appointed consecutively to more than two terms as a member of LUC nor had his membership on LUC exceeded eight consecutive years."  Id.  The ICA held that the circuit court erred in holding that Kanuha was not a valid holdover based on the Senate's rejection of his nomination, and reversed the circuit court's judgment.  Id. at 377-78, 289 P.3d at 1013-14.  Given its disposition, the ICA did not address whether the circuit court erred in holding that six votes were necessary for the LUC's October 15, 2010 approval of the Decision and Order, although the ICA characterized the vote as "the ministerial act

---

[12]    The Honorable Daniel R. Foley, Alexa D.M. Fujise, and Katherine G. Leonard presided.  The parties filed four separate appeals from the circuit court's order denying the LUC's supplemental memorandum on jurisdiction, order denying Castle & Cooke's motion for reconsideration, and final judgment.  The ICA consolidated the appeals by order on November 16, 2011.

of approving LUC's decision as to form."[13]  Id. at 378 n.3, 289

P.3d at 1014 n.3.

In its application for writ of certiorari, the Sierra

Club maintained that Kanuha was statutorily disqualified from

voting on the Reclassification Petition under HRS § 26-34 because

he failed to receive the advice and consent of the Senate for his

second term.  The Sierra Club argued that "[w]hen read within the

entire framework of § 26-43, the disqualifying criteria logically

include[s]" the member's failure to receive the Senate's advice

and consent for reappointment.  The Sierra Club further argued

that the ICA's narrow interpretation of the term "disqualified"

to only disqualify members who served for two terms or eight

---

[13]    The ICA also did not address Castle & Cooke's and the LUC's argument that the circuit court erred in determining that it had subject matter jurisdiction over the appeal.  Both parties argued that the Sierra Club's Motion to Disqualify was in the nature of a quo warranto action and therefore governed by HRS Chapter 659.  See supra note 9.  They contended that the LUC lacked jurisdiction to determine quo warranto actions and that the circuit court therefore lacked jurisdiction to review the appeal.
        The parties have not raised the issue of jurisdiction on appeal to this court.  However, we address the issue sua sponte.  See Chun v. Employees' Ret. Sys., 73 Haw. 9, 13, 828 P.2d 260, 263 (1992) ("If the parties do not raise the issue [of lack of subject matter jurisdiction], a court sua sponte will, for unless jurisdiction of the court over the subject matter exists, any judgment rendered is invalid.") (quotation marks and citations omitted).
        We conclude that the circuit court properly exercised subject matter jurisdiction over Sierra Club's appeal from the LUC's Decision and Order approving the Reclassification Petition.  See HRS § 205-4(i) (2001) ("Parties to proceedings to amend land use district boundaries may obtain judicial review thereof in the manner set forth in section 91-14"); HRS § 91-14(a) ("Any person aggrieved by a final decision and order in a contested case . . . is entitled to judicial review").  Additionally, the LUC had jurisdiction to consider the Motion to Disqualify.  See HRS § 659-10 (1993) ("Nothing in this chapter shall preclude the obtaining of relief available by quo warranto by other appropriate action."); Dejetley v. Kahoʻohalahala, 122 Hawaiʻi 251, 269, 226 P.3d 421, 439 (2010) (permitting declaratory action to proceed even though quo warranto relief may have been available); HAR § 15-15-70 (providing that motions may be made "before, during, or after the close of a hearing" on a petition for boundary amendment and "[m]otions that do not involve the final determination of a proceeding may be heard and determined by the chairperson, commissioner, or hearings officer").

consecutive years has the effect of undermining the Senate's advice and consent power under article V, section 6 of the Hawaiʻi Constitution.

II.

A.

Pursuant to HRS § 205-1 (Supp. 2010), the LUC consists of nine members who "shall be appointed in the manner and serve for the term set forth in section 26-34." Six affirmative votes are required to approve any district boundary amendment under HRS § 205-1, as well as under HRS § 205-4, which applies to district boundary amendments involving land areas greater than fifteen acres.

HRS § 26-34 (2009), entitled "Selection and terms of members of boards and commissions," governs the process by which an individual is qualified to serve as a commissioner. The statute provides that members of a commission "shall be nominated and, by and with the advice and consent of the senate, appointed by the governor":

> **Selection and terms of members of boards and commissions**. (a) The members of each board and commission established by law shall be nominated and, by and with the advice and consent of the senate, appointed by the governor. Unless otherwise provided by this chapter or by law hereafter enacted, the terms of the members shall be for four years; provided that the governor may reduce the terms of those initially appointed so as to provide, as nearly as can be, for the expiration of an equal number of terms at intervals of one year for each board and commission. Unless otherwise provided by law, each term shall commence on July 1 and expire on June 30 . . . . No person shall be appointed consecutively to more than two terms as a member of the same board or commission; provided that membership on any board or commission shall not exceed eight consecutive years.

-15-

> (b) Any member of a board or commission whose term has expired and who is not disqualified for membership under subsection (a) may continue in office as a holdover member until a successor is nominated and appointed; provided that a holdover member shall not hold office beyond the end of the second regular legislative session following the expiration of the member's term of office.

(Emphases added).

At issue in this case is whether an LUC commissioner whose first term has expired can continue to serve as a holdover member under subsection (b) after the Senate has rejected the commissioner's nomination for a second term pursuant to subsection (a). In other words, the relevant question is whether the Senate's rejection of Kanuha's nomination for a second term rendered Kanuha "disqualified for membership under subsection (a)" and therefore unable to serve as a valid holdover member.

The ICA concluded that the Senate's refusal to confirm a nomination is irrelevant to the determination of holdover status because the only way in which an LUC member can be "disqualified for membership under subsection (a)" is for the member to serve more than two consecutive terms or eight consecutive years. 128 Hawaiʻi at 377, 289 P.3d at 1013.

"Statutory interpretation is a question of law reviewable de novo." State v. Wheeler, 121 Hawaiʻi 383, 390, 219 P.3d 1170, 1177 (2009) (quotation marks omitted). In this case, the ICA's interpretation of HRS § 26-34 is contrary to the plain language of the statute and the intent of the legislature. See Riethbrock v. Lange, 128 Hawaiʻi 1, 11, 282 P.3d 543, 553 (2012) ("implicit in the task of statutory construction is our foremost

-16-

obligation to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself") (quotation marks and citation omitted).

HRS § 26-34(b) provides that "[a]ny member of a board or commission whose term has expired <u>and who is not disqualified for membership under subsection (a)</u> may continue in office as a holdover member until a successor is nominated and appointed[.]" (Emphasis added).  "Under general principles of statutory construction, courts give words their ordinary meaning unless something in the statute requires a different interpretation." <u>Saranillio v. Silva</u>, 78 Hawaiʻi  1, 10, 889 P.2d 685, 694 (1995).  <u>See</u> HRS § 1-14 (2009) ("The words of a law are generally to be understood in their most known and usual signification, without attending so much to the literal and strictly grammatical construction of the words as to their general or popular use or meaning.").  "[I]t must be supposed that the legislature, in enacting a statute, intended that the words used therein should be understood in the sense in which they are ordinarily and popularly understood by the people, for whose guidance and government the law was enacted . . . ."  <u>In re Taxes of Johnson</u>, 44 Haw. 519, 530, 356 P.2d 1028, 1034 (1960) (quotation marks omitted).

In the holdover provision at issue here, the legislature used the phrase "disqualified for membership under

subsection (a)" to describe commissioners who are not permitted to serve as holdover members.  "Disqualification" means "[t]he act of making ineligible; the fact or condition of being ineligible."  Black's Law Dictionary 540 (9th ed. 2009) [hereinafter Black's Law].  See Webster's Third New Int'l Dictionary 655 (1993) [hereinafter Webster's] (defining "disqualify" to mean "to deprive of the qualities, properties, or conditions necessary for a purpose" or "to deprive of a power, right, or privilege").  "Dis" is a prefix meaning to "do the opposite of" or "reverse."  Id. at 642.  Thus, subsection (b) provides that persons who were formerly qualified are no longer qualified to serve as holdover members as defined by "subsection (a)."

Subsection (a) sets forth the manner in which an individual becomes eligible to serve as a commissioner, providing that such members "shall be nominated and, by and with the advice and consent of the senate, appointed by the governor."  HRS § 26-34(a) (emphases added).  Cf. Blair v. Harris, 98 Hawaiʻi 176, 179, 45 P.3d 798, 801 (2002) ("'Eligible' means 'fit or proper to be chosen' or 'legally qualified to be elected or appointed to office.'") (quoting Random House College Dictionary 429 (Rev. Ed. 1979)).  Accordingly, an individual can only become eligible to serve as an LUC commissioner by being nominated by the governor and thereafter confirmed by the Senate.  The last sentence of subsection (a) limits an LUC member to no more than two

-18-

consecutive terms, i.e. eight consecutive years.[14] HRS § 26-34(a). Thus, considered in its entirety, subsection (a) encompasses two situations in which a member would be "disqualified for membership," or become ineligible where the member was formerly eligible: 1) a nominated member is rejected by the Senate; or 2) a member has consecutively served two terms or eight years.[15]

Subsection (b) references "subsection (a)" as a whole when describing an eligible holdover member as any member "who is not disqualified for membership under subsection (a)." Thus, the word "disqualified" must be construed to give it meaning within the context of all provisions of subsection (a). See Potter v. Haw. Newspaper Agency, 89 Hawaiʻi 411, 422, 974 P.2d 51, 62-63 (1999) ("Our rules of statutory construction require us to reject an interpretation of [a] statute that renders any part of the statutory language a nullity."); Blair, 98 Hawaiʻi at 179, 45 P.3d at 801 ("Courts are bound to give effect to all parts of a statute, and no clause, sentence, or word shall be construed as

---

[14]    An LUC member's term is four years. HRS § 26-34(a) ("Unless otherwise provided by this chapter or by law hereafter enacted, the terms of the members shall be four years"); HRS § 205-1 (LUC members shall "serve for the term set forth in section 26-34"). Accordingly, it appears that the requirement that an LUC member not serve for longer than two consecutive terms is the same as the requirement that a member not serve for longer than eight consecutive years.

[15]    A member who has not been nominated for a second term is not disqualified from serving as a holdover under the plain language of HRS § 26-34(b), as the member continues to occupy a status of being eligible for nomination and confirmation, whereas the Senate's rejection of a member's nomination for a second term renders the member ineligible, and therefore disqualified for membership under subsection (a).

superfluous, void, or insignificant if a construction can be legitimately found which will give force to and preserve all words of the statute.") (quotation marks, citation and ellipses omitted).

Because subsection (a) identifies two situations in which an individual would be disqualified for membership, the plain meaning of subsection (b) is that a member is not eligible to serve as a holdover if either situation is applicable.

Therefore, a member who is nominated but rejected by the Senate is "disqualified" from serving as a holdover member.

On the other hand, an LUC member who has served one term and who has not been re-nominated and rejected by the Senate is permitted to serve as a holdover under subsection (b) until a successor is appointed or nominated within a "reasonable time,"[16] or until "the end of the second regular legislative session following the expiration of the member's term of office." HRS § 26-34(b). In this case, Kanuha was able to serve nearly ten months as a valid holdover from June 30, 2009, when his first term expired, until April 26, 2010, when the Senate rejected his nomination for a second term. In the absence of re-nomination and Senate rejection, Kanuha could have continued to serve as a

---

[16] This court has stated that under HRS § 26-34, "the governor would be entitled to at least a reasonable time after a term expires to nominate a qualified person to a board or commission." Life of the Land v. Burns, 59 Haw. 244, 251, 580 P.2d 405, 410 (1978). See Hanabusa v. Lingle, 119 Hawaiʻi 341, 351, 198 P.3d 604, 614 (2008) (per curiam) (holding that governor's duty to nominate and appoint members of the Board of Regents of the University of Hawaiʻi "is subject to a reasonable time standard," "judged by the totality of the circumstances").

holdover member subject to the limitation that holdover status not extend beyond the end of the second regular legislative session following the expiration of his first term, and subject to the requirement that the governor appoint a successor within a reasonable time. Thus the plain language of the statute is not superfluous, as a member who has not been rejected by the Senate may serve as a holdover for up to two years after the expiration of the member's term. However, HRS § 26-34(b) disqualifies a member who has served one term from holding over upon rejection by the Senate, as that member is no longer eligible to serve on the LUC at all.

Moreover, under the ICA's interpretation of HRS § 26-34, a member who had served only one term could never be disqualified from serving as a holdover because the "sole" basis for disqualification is for a member to have served two consecutive terms. 128 Hawaiʻi at 377, 289 P.3d at 1013. Pursuant to this interpretation, a one-term member would always be entitled to continue serving as a holdover, potentially until the end of the second regular legislative session following the expiration of the member's term; in this case, that date would have been May 5, 2011, or nearly two years after Kanuha's first term expired and over a year after the Senate's rejection. Under the ICA's interpretation, the Senate would have no recourse during this time to terminate the member's holdover status despite rejecting the member's nomination for a second term.

Yet, if it was the legislature's intent to so restrict its power and to limit the members who could be disqualified from serving as holdovers, the legislature could have simply disqualified any member who had served more than two terms. Instead, the legislature referenced "subsection (a)" in its entirety to define the way a member is "disqualified" from serving as a holdover member.

As specifically drafted by the legislature, subsection (a) plainly provides that an individual may only become eligible to serve as a member of the LUC by receiving the Senate's consent. For a member who has already served a term, the Senate's act of rejecting the member's nomination for a second term is an act that disqualifies the member from holding over. To presume the legislature would have used the phrase "disqualified for membership under subsection (a)" to apply exclusively to members who had served more than two consecutive terms is illogical and nullifies the general meaning and application of the words employed by the legislature.

B.

The legislative history of HRS § 26-34 also reflects that the intent of the statute was to prohibit a member from serving as a holdover where the member's nomination for a second term has been rejected by the Senate. See Franks v. City & Cnty. of Honolulu, 74 Haw. 328, 335, 843 P.2d 668, 671-72 (1993) ("If the statutory language is ambiguous or doubt exists as to its

-22-

meaning, courts may take legislative history into consideration in construing a statute.") (quotation marks and brackets omitted).

1.

When the holdover provision under HRS § 26-34(b) was adopted in 1984, the original version of the bill provided that "Any member of a board or commission whose term has expired and who is <u>not disqualified</u> for membership under subsection (a) may continue in office as a holdover member[.]"  S.B. 1725-84, 12th Leg., Reg. Sess. (1984) (emphasis added).

The Senate Judiciary Committee then amended the bill to provide, "Any member of a board or commission whose term has expired and who is <u>not qualified</u> for membership under subsection (a) may continue in office as a holdover member[.]"  S.B. 1725-84, S.D. 1, 12th Leg., Reg. Sess. (1984) (emphasis added).[17]

Subsequently, the House Judiciary Committee changed the word "qualified" back to "disqualified."  S.B. 1725-84, S.D. 1, H.D. 1, 12th Leg., Reg. Sess. (1984).  The report, as reproduced in the House Journal, provides that the intent of the proposed amendment was to allow any member of a board whose term has expired and who is not "disqualified for membership" to serve only two years beyond the member's four-year appointment:

> Your Committee finds that the bill, as received, would allow for a member's term of office to extend beyond eight years.

---

[17]    The Senate's discussion of the amendment indicates that the use of the word "qualified" was a typographical error and should have read "disqualified."  <u>See</u> 1984 Senate Journal, at 330.

> <u>However, the intent of the proposed amendment to section 26-34, Hawaii Revised Statutes, is to allow any member of a board or commission whose term has expired and who is not disqualified for membership to serve only two years beyond the member's four-year appointment</u>.  Accordingly, your Committee has amended the bill by changing the word "qualify" in page 2, line 6, to "disqualify" to clarify the legislative intent.

H. Stand. Comm. Rep. No. 690-84, in 1984 House Journal, at 1194 (emphasis added).

The House Standing Committee Report No. 690-84 retained in the Hawaiʻi State Archives contains slightly different language from the version of the report that appears in the House Journal.[18]  The Committee Report provides that the intent of the amendment was to allow any member whose term has expired and "who is not disqualified from serving another term" to serve only two years beyond the member's "first four-year appointment":

> Your Committee finds that the bill, as received, would allow for a member's term of office to extend beyond eight years.  However, the intent of the proposed amendment to section 26-34, Hawaii Revised Statutes, is to allow any member of a board or commission whose term has expired and who is not disqualified <u>from serving another term</u> to serve only two years beyond the member's <u>first</u> four-year appointment.  Accordingly, your Committee has amended the bill by changing the word "qualify" in page 2, line 6, to "disqualify" to clarify the legislative intent.

H. Stand. Comm. Rep. No. 690-84, 12th Leg., Reg. Sess. (1984) (emphases added).  The Committee Report is dated March 30, 1984 and is signed by the committee members.

In both versions, the language of the House Committee report indicates that the legislature intended for members to be

---

[18]    The Archives does not have any amended reports or other documents explaining the reason for the discrepancy between the two versions of the report.  The House Journal provides only that the "Stand. Com. Rep. No. 690-84 on S.B. No. 1725-84, SD 1, HD1," was adopted.  1984 House Journal, at 416.

disqualified by factors other than serving beyond eight consecutive years.  In other words, the legislature intended to limit holdover membership to members who had served only two years beyond the member's first four-year term and to members who were not otherwise "disqualified for membership."

The version of the report reproduced in the House Journal provides that the intent of the holdover provision was to allow a member "whose term has expired and who is not disqualified for membership to serve only two years beyond the member's four-year appointment."  H. Stand. Comm. Rep. No. 690-84, in 1984 House Journal, at 1194 (emphasis added).  The report clearly focuses on members who had only served one term thus far, as anyone who had served two consecutive terms would already be excluded from serving as a holdover based on the subsection (a) clause providing that membership "shall not exceed eight consecutive years."  HRS § 26-34(a).

If it had been the legislature's sole intent to limit the time that a holdover member was permitted to serve, without imposing any other disqualifying factors, then such a result could have been easily achieved without including the language "and who is not disqualified for membership" in the committee report.  The report would have then simply read: "the intent of the proposed amendment to section 26-34, Hawaii Revised Statutes, is to allow any member of a board or commission whose term has

expired to serve only two years beyond the member's four-year appointment."

The focus on one-term members is even clearer in the signed Committee Report retained in the Archives, which expressly states that the holdover provision was intended to allow any member whose term has expired and "who is not disqualified <u>from serving another term</u>" to serve only two years beyond the member's "<u>first</u> four-year appointment."  (Emphases added).

Thus, the reference to members who are "not disqualified" in both versions of the Committee Report and the resulting inclusion of the phrase "and who is not disqualified for membership under subsection (a)" in HRS § 26-34(b) manifestly indicates that the legislature intended for disqualification to apply to circumstances other than the number of years that a member has served.  The legislature's clear intent was to require holdover members to be members who had only served one term, and who were not disqualified from serving another term.

2.

There are several additional reasons underscoring the conclusion that the legislature did not intend for the disqualification provision to apply solely to two-term members such that a member who had served only one term could never be disqualified from serving as a holdover member.

First, HRS § 26-34(c) (2009) expressly provides that "[a] vacancy occurring in the membership of any board or commission during a term shall be filled for the unexpired term

thereof, subject to Article V, Section 6 of the Constitution of the State."  In 1984, when the holdover member provision was added to HRS § 26-34, the House Public Employment and Government Operations committee noted that "allowing holdover membership with limitations on the length of service of a holdover board or commission member better serves the intent of Article V, Section 6[.]"  H. Stand. Comm. Rep. No. 604-84, in 1984 House Journal, at 1148.  See S. Stand. Comm. Rep. No. 229-84, in 1984 Senate Journal, at 1087 ("Your Committee finds that limiting the length of service of a holdover board or commission member better serves the intent of Article V, Section 6 of the State Constitution[.]").

Article V, section 6, which governs executive and administrative offices and departments, provides that the governor may appoint individuals for interim appointments to any office if a vacancy occurs while the Senate is not in session. Haw. Const. art. V, § 6.  The interim appointment expires at the end of the next Senate session, unless the appointment is confirmed by the Senate.  Id.  However, section 6 specifically provides that an individual whose nomination for appointment to any office has been rejected by the Senate is no longer eligible to serve an interim appointment in that office:

> When the senate is not in session and a vacancy occurs in any office, appointment to which requires the confirmation of the senate, the governor may fill the office by granting a commission which shall expire, unless such appointment is confirmed, at the end of the next session of the senate. The person so appointed shall not be eligible for another interim appointment to such office if the appointment failed to be confirmed by the senate.

> No person who has been nominated for appointment to any office and whose appointment has not received the consent of the senate shall be eligible to an interim appointment thereafter to such office.

Id. (emphasis added).

Under the State constitution, then, an individual who has not received the Senate's consent to be appointed to any office is no longer eligible to serve an interim appointment to such office, even though an interim appointment is already limited in length to the end of the next Senate session. It would have been illogical for the committee reports to state that limiting the length of service of a holdover member "better serves the intent of Article V, Section 6," if the holdover provision was intended to permit a rejected nominee to remain serving as a holdover for up to two years when the nominee would be ineligible to serve as an interim appointee under the constitution. See State v. Arceo, 84 Hawaiʻi 1, 19, 928 P.2d 843, 861 (1996) ("The legislature is presumed not to intend an absurd result, and legislation will be construed to avoid, if possible, inconsistency, contradiction, and illogicality.") (brackets and quotation marks omitted).

Second, allowing a board member who has been expressly denied reappointment to continue serving up to two years after the expiration of the member's first term has the unquestioned effect of diminishing the advice and consent power of the Senate. "[T]he subject of appointment of members to boards and commission[s] must necessarily be considered to be the joint responsibility of the governor and senate[.]" Life of the Land

v. Burns, 59 Haw. 244, 251, 580 P.2d 405, 410 (1978). The ICA's interpretation of HRS § 26-34 essentially provides the executive with a means to bypass the will of the Senate by enabling a board member to continue serving in a position that the Senate has expressly recognized the member to be disqualified from filling. Indeed, pursuant to the ICA's opinion, the executive can leave the disqualified member in that position until two years have passed or until forced to appoint a new member by a court order determining that the length of the holdover term has become unreasonable. See 128 Hawaiʻi at 377 n.2, 289 P.3d at 1013 n.2 (noting that Kanuha would be prevented from "serving indefinitely" because the governor would be required to appoint a successor "within a reasonable period of time"). The legislative history of the statute does not indicate that such an effect was intended.

According to the LUC, however, the Senate's advice and consent power is not diminished by permitting a rejected member to continue serving as a holdover because "[a] holdover is an extension of a term to which advice and consent of the Senate has already been given." Thus, the LUC argues that the Senate's refusal to consent to the member's nomination for a second term has no effect on the member's ability to serve as a holdover because the Senate has already impliedly consented to the holdover term. However, a member's authority to serve as a holdover is not based on the Senate's implicit consent. Rather, the authority for serving as a holdover derives from HRS § 26-34,

which expressly authorizes holdover members within the statutory restrictions.  Moreover, even assuming that the Senate's consent for the member's first term constitutes implied consent for the member to serve as a holdover, any implicit consent would be revoked upon the Senate expressly declining to consent to the member's nomination for a second term.  See Black's Law, supra at 346 (defining "implied consent" as "[c]onsent inferred from one's conduct rather than from one's direct expression").

Finally, any vacancies created by the Senate's rejection of an LUC member's nomination may be filled by the governor, who has the ability to nominate another individual or to appoint an interim appointee under article V, section 6 of the State constitution.  Even if a temporary vacancy were to occur before the governor took such action, the vacancy would not obstruct the LUC's consideration of matters before it inasmuch as the LUC is comprised of nine members and only six affirmative votes are required for any boundary amendment.  HRS § 205-1.

C.

Accordingly, the plain language of HRS § 26-34(b) and the legislative history of the holdover provision demonstrate that the legislature intended to require a holdover to be a member "who is not disqualified for membership under subsection (a)."  A member whose nomination for a second term has been rejected by the Senate is disqualified from serving another term and therefore "disqualified for membership under subsection (a)."  The legislative history of the statute does not indicate that it

was the legislature's <u>sole</u> intent to limit the length of time that a holdover member was allowed to serve, without imposing any other disqualifying factors.

Additionally, interpreting HRS § 26-34(b) to solely disqualify members who had served either two consecutive terms or eight years is inconsistent with article V, section 6, which disqualifies individuals rejected by the Senate from serving as interim appointees. Finally, interpreting the holdover provision to allow a board member who has been rejected by the Senate to continue serving up to two years after the expiration of the member's term or until a "reasonable time" has elapsed undermines the Senate's advice and consent power.

The ICA therefore erred in determining that Kanuha continued to serve as a valid holdover after the Senate's rejection of his nomination for a second term.

### III.

Because Kanuha was not a valid holdover member of the LUC under HRS § 26-34, his actions taken with respect to the Reclassification Petition are invalid unless determined to be valid through an application of the de facto officer doctrine.

### A.

This court has defined an "officer de jure" as "one who is in all respects legally appointed . . . and qualified to exercise the office[.]" Office of Hawaiian Affairs v. Cayetano, 94 Hawaiʻi 1, 7, 6 P.3d 799, 805 (2000) (quotation marks and brackets omitted) [hereinafter <u>OHA</u>]. In contrast, a "de facto

official" is "one who by some color of right is in possession of an office, and for the time being performs his or her duties with public acquiescence, <u>though having no right in fact</u>[.]" 63C Am. Jur. 2d <u>Public Officers and Employees</u> § 23 (2d ed. 2009) (emphasis added).

The de facto officer doctrine gives legal effect to the public acts of de facto officers, <u>id.</u>, and precludes challenges to government action "on the ground that the officials who took the action were improperly in office." <u>Andrade v. Lauer</u>, 729 F.2d 1475, 1496-97 (D.C. Cir. 1984). In <u>OHA</u>, this court recognized that "[c]ourts have consistently held that actions taken by *de facto* officeholders are valid and enforceable." 94 Hawaiʻi at 7, 6 P.3d at 805.

The de facto officer doctrine was adopted from the common law of England. <u>See</u> Kathryn A. Clokey, <u>The De Facto Officer Doctrine: The Case for Continued Application</u>, 85 Colum. L. Rev. 1121, 1125 (1985) ("The doctrine was received in this county as part of the common law, and the United States has become the locus of its most prolific development.") (footnote omitted). "[T]he doctrine's purpose is to protect the public's reliance on an officer's authority and to ensure the orderly administration of government by preventing technical challenges to an officer's authority." 63 Am. Jur. 2d § 23.

In <u>OHA</u>, this court identified the following four circumstances in which an officer becomes a de facto officer:

> A officer becomes a *de facto* officer under four circumstances: (1) by exercising his or her duties without a

-32-

> known appointment or election, but under such circumstances of reputation or acquiescence as were calculated to induce people, without inquiry, to submit to or invoke his or her action, supposing him or her to be the officer he or she assumed to be; (2) where the official exercises his or her duties under color of known and valid appointment or election, but fails to conform to some precedent, requirement, or condition, such as to take an oath, give a bond, or the like; (3) under color of a known election or appointment, void because the officer was not eligible, or because there was a want of power in the electing or appointing body, or by reason of some defect or irregularity in its exercise, such ineligibility, want of power, or defect being unknown to the public; or (4) under color of any election or an appointment by or pursuant to a public unconstitutional law, before the same is adjudged as such.

94 Hawaiʻi at 7, 6 P.3d at 805.

During oral argument, counsel for the LUC indicated that the third category delineated by the OHA court would be applicable to the circumstances of this case. Oral Argument at 40:49-41:08 (Feb. 7, 2013), Sierra Club v. Castle & Cooke Homes Haw., Inc., No. SCWC-11-0000625, available at http://state.hi.us/jud/oa/13/SCOA_020713_11_0625.mp3 [hereinafter Oral Argument]. Under the third OHA category, an officer becomes a de facto officer when exercising his or her duties "under color of a known . . . appointment, void because the officer was not eligible, or because there was a want of power in the electing or appointing body, or by reason of some defect or irregularity in its exercise, such ineligibility, want of power, or defect being unknown to the public[.]" Id. (emphases added). "Color" means "[a]ppearance, guise, or semblance; esp., the appearance of a legal claim to a right, authority, or office." Black's Law, supra at 301.

Consequently, in order for the third category to apply, the officer must appear to have legal authority and the defect in

-33-

the officer's eligibility must be unknown to the public. In this case, the Senate rejected Kanuha's nomination for a second term on April 26, 2010, which effectively served as public notice that Kanuha was ineligible to serve as a holdover member. Additionally, the Sierra Club filed its Motion to Disqualify with the LUC on September 8, 2010, prior to the LUC's September 23, 2010 vote to approve the Reclassification Petition and the October 15, 2010 vote to approve the Decision and Order. The defect in Kanuha's eligibility to continue serving as a holdover member was therefore known to the public, Castle & Cooke, and the LUC when Kanuha participated in the voting on the Reclassification Petition. Under these circumstances, it cannot be said that Kanuha was a de facto officer pursuant to the third OHA category.

The other categories set forth in OHA are similarly inapplicable in this case. In contrast to the other three categories, which involve appointed officers with defective appointments, the first OHA category refers to an officer who was not appointed in the first instance, but who has nevertheless been holding himself or herself out as a de jure officer: "(1) by exercising his or her duties without a known appointment or election, but under such circumstances of reputation or acquiescence as were calculated to induce people, without inquiry, to submit to or invoke his or her action[.]" 94 Hawaiʻi at 7, 6 P.3d at 805 (emphasis added). In this case, the issue is not whether Kanuha was appointed to be an LUC officer at all.

Kanuha was validly appointed to serve his first term.  However, following his first term, he was disqualified from continuing to serve as a de jure holdover because of the Senate's rejection of his nomination for a second term.  The first OHA category is therefore inapplicable to the facts of this case.

In regard to the second OHA category, Kanuha was not exercising his duties "under color of a known and valid appointment . . . , but fail[ing] to conform to some precedent, requirement, or condition, such as to take an oath, give a bond, or the like[.]"  Id.  As stated, Kanuha was not acting under "color" of a valid appointment, given the public nature of the Senate's rejection of his nomination.  The Senate's rejection, which disqualified Kanuha from holdover status, is also unlike the failure to conform to a technical requirement such as taking an oath, furnishing a bond, or being under the required age for members.  See Black's Law, supra at 1194 (a de facto officer may have "failed to qualify for office for any one of various reasons, [such] as . . . being under the required age, having failed to take the oath, [or] having not furnished a required bond").  Such imperfections in an officer's authority are more likely to be overlooked by members of the public who rely on the finality of government decisions, thereby necessitating the application of the de facto officer doctrine.  In this case, however, the Senate publicly rejected Kanuha's nomination for a second term, which served as notice of Kanuha's disqualification to the public, the LUC, and Castle & Cooke.

Finally, with respect to the fourth <u>OHA</u> category, Kanuha was not exercising his duties "under color of [an] election or an appointment by or pursuant to a public unconstitutional law, before the same is adjudged as such." 94 Hawaiʻi at 7, 6 P.3d at 805. In <u>OHA</u>, the court found that this definition was applicable, where eight trustees of the Office of Hawaiian Affairs "were elected under the color of an election pursuant to an unconstitutional public law, before the law was adjudged to be unconstitutional" by the U.S. Supreme Court in <u>Rice v. Cayetano</u>, 528 U.S. 495 (2000). 94 Hawaiʻi at 4-5, 8, 6 P.3d at 801-02, 805. The court held that the trustees became *de facto* officials following the <u>Rice v. Cayetano</u> decision. <u>Id.</u> at 7-8, 6 P.3d at 805-06. In this case, there is no issue regarding whether Kanuha was appointed pursuant to an unconstitutional public law; rather, the issue is whether Kanuha was disqualified from holdover status pursuant to a valid public law.

Accordingly, Kanuha is not a de facto officer under the parameters of the doctrine articulated by this court in <u>OHA</u>.

### B.

Counsel for the LUC argued during oral argument that the four <u>OHA</u> categories were merely "examples" of how one becomes a de facto officer, and do not constitute an exhaustive list. Oral Argument at 41:04-42:00. However, nothing in the <u>OHA</u> decision indicates that there are other bases, outside of the four enumerated categories, for invoking the de facto officer doctrine. The court did not provide that an officer becomes a de

facto officer under certain circumstances, <u>including</u> the four categories.  Rather, the court affirmatively stated that an "officer becomes a *de facto* officer <u>under four circumstances</u>[.]" 94 Hawaiʻi at 7, 6 P.3d at 805 (emphasis added).

In addition, the four <u>OHA</u> categories were first articulated by the Connecticut Supreme Court in <u>State v. Carroll</u>, 38 Conn. 449 (1871).  The <u>Carroll</u> court undertook a review of English and American cases invoking the doctrine and found that the cases did not provide a concise general definition of the doctrine.  <u>Id.</u> at 467-71.  The court explained that it was "[d]oubtless" that the de facto doctrine requires "color of election or appointment from competent authority."  <u>Id.</u> at 471. The court then provided the four-part definition of the doctrine, stating that the definition was "sufficiently accurate and comprehensive to cover the whole ground" of the de facto officer doctrine.  <u>Id.</u> at 471-72.  The court stated that "[a]nything less comprehensive and discriminating will, I think, be imperfect and deceptive as a definition."  <u>Id.</u> at 472.

Subsequently, the U.S. Supreme Court favorably cited <u>Carroll</u>, calling the opinion "an elaborate and admirable statement of the law . . . on the validity of the acts of *de facto* officers, however illegal the mode of their appointment." <u>Norton v. Shelby Cnty.</u>, 118 U.S. 425, 445-46 (1886).  <u>See</u> Clokey, <u>supra</u> at 1125 ("In *State v. Carroll*, the Connecticut Supreme Court articulated the <u>definitive American expression of the doctrine</u>[.]") (footnote omitted) (emphasis added); <u>People v.</u>

Wortman, 165 N.E. 788, 789 (Ill. 1928) ("The definition of an officer de facto in the case of [Carroll] has been approved by many courts."). The Shelby Court further considered whether the fourth Carroll category was applicable to the circumstances of that case, before holding that the definition did not apply where the issue was the unconstitutionality of the act creating the office itself. 118 U.S. at 446. The Court held that the public officers in that case were mere usurpers rather than de facto officers, and reasoned that its decision was "in harmony" with Carroll. Id. at 445.

The OHA court's definition of the de facto officer doctrine, which is identical to the Carroll court's definition, should therefore be considered a definitive expression of the doctrine.

Nevertheless, counsel for the LUC argued that the OHA court's definition of a de facto officer is not dispositive because in In re Sherretz, 40 Haw. 366, 373 (Terr. 1953), the court applied a more general standard for determining an officer's de facto status. Oral Argument at 41:25-42:00. In Sherretz, the court acknowledged several definitions frequently given to de facto officers. 40 Haw. at 372-73. The court also reviewed numerous cases on the issue of de facto officers, including Carroll, which the court viewed favorably, stating that Carroll "gives a comprehensive definition of an officer de facto." Id. at 377-78. The court then recited the four Carroll/OHA categories. Id. The court concluded, based on its

-38-

review of a wide variety of cases, the public officer in that case "came within the requirements of a *de facto* official." Id. at 380. Inasmuch as the Sherretz court did not adopt a definitive definition of the de facto officer doctrine, it is not dispositive in this case. Moreover, the Caroll definition that was viewed favorably by the Sherretz court was later expressly adopted by this court in OHA.

The four OHA categories thus constitute a comprehensive definition of the de facto officer doctrine as adopted by this court. In this case, Kanuha does not qualify as a de facto holdover under any of the four tests because of the uniqueness of the Senate's rejection of his nomination as a disqualifying defect.

C.

Furthermore, not only does Kanuha fail to qualify as a de facto officer under the four OHA categories, he also fails to qualify under the most basic, fundamental understanding of the doctrine.

The very basis of a de facto officer's authority is the appearance or color of authority. See Black's Law, supra at 301 (defining "color" as "the appearance of a legal claim to a right, authority, or office"); Sherretz, 40 Haw. at 373 (all that is required is possession of office, performance of duties, and "claiming to be such officer under color of an election or appointment") (quotation marks omitted); Carroll, 38 Conn. at 471 ("Doubtless color of election or appointment from competent

-39-

authority is necessary for the protection of an officer *de facto*."); Nguyen v. United States, 539 U.S. 69, 77 (2003) (de facto officer doctrine "confers validity upon acts performed by a person acting under the color of official title even though it is later discovered that the legality of that person's appointment or election to office is deficient.") (quotation marks omitted) (emphasis added); Equal Emp't Opportunity Comm'n v. Sears, Roebuck & Co., 650 F.2d 14, 18 (2d Cir. 1981) ("Since the primary purpose of the doctrine is to protect the public and the government agencies which act in reliance on the validity of an officer's actions," the officer's "appearance to others" is more directly pertinent than the officer's own knowledge of defects in title).  Because appearance of right is the essence of a de facto officer's authority, "[i]f an official's claim to office is known to be unlawful, the notoriety of his title defect prevents a finding of color of authority."  Clokey, supra at 1123.  See Gutierrez v. Guam Election Comm'n, No. WRM10-003 2011 WL 768694, at *16 (Guam Terr. Feb. 3, 2011) ("A de facto officer performs duties under color of right, or color of official title, when a defect in the officers authority . . . escapes public notice.").

This emphasis on appearance of authority is consistent with the primary interests served by the de facto officer doctrine, which are the protection of "citizens' reliance on past government actions and the government's ability to take effective and final action[.]"  Andrade, 729 F.2d at 1499.  If a public officer is, by all appearances, exercising his or her duties

under color of authority, then it is in the public interest to grant validity to the officer's actions even if it is later discovered that the officer's authority was defective.  See Norton, 118 U.S. at 445 ("The official acts of [de facto officers] are recognized as valid on grounds of public policy, and for the protection of those having official business to transact.") (quotation marks omitted); State v. Oren, 627 A.2d 337, 339 (Vt. 1993) ("Third persons are entitled to rely on the actions of such public officers without the necessity of investigating their title.").

In Sherretz, the court applied the de facto officer doctrine to validate the acts of a member of the civil service commission, who continued to serve on the commission after accepting an appointive office as a notary public.  40 Haw. 366.  While declining to determine whether the member rendered himself ineligible to serve on the commission by accepting the appointive office, the court concluded that the member was at least a de facto official, reasoning: "It is undisputed that Kum was in possession of the office, performing its duties, claiming to be an officer under color of an appointment, his right unquestioned by the appointing authority or by the other members of the commission operating with him; he thus came within the requirements of a *de facto* official."  Id. at 380 (emphasis added).  On the above basis, the member's "acts were as valid as though he had an undisputed legal title."  Id.

In this case, however, the defect in Kanuha's authority was known to the public following his rejection by the Senate. The Senate's act of rejecting his appointment occurred in the most public of venues, with the Senate committee that reviewed Kanuha's nomination expressing concern over Kanuha's lack of experience and knowledge in traditional Hawaiian land usage and cultural practices. S. Stand. Comm. Rep. No. 3208, 2010 Senate Journal, at 1332. Subsequently, during the floor debates on his nomination, Senate members again focused on Kanuha's lack of experience and knowledge before voting to reject his nomination. 2010 Senate Journal, at 561-64. Even assuming this very public Senate proceeding was not known to the LUC, following the filing of the Sierra Club's Motion to Disqualify, the LUC and Castle & Cooke clearly would have become aware of Kanuha's disqualification. Thus the notoriety of Kanuha's title defect following the Senate's rejection prevents a finding of color of authority, which is a critical component of the de facto officer doctrine under any definition of the doctrine.

D.

Finally, applying the de facto officer doctrine to validate Kanuha's votes on the Reclassification Petition in this case would be contrary to the public policy purposes of the doctrine.

As previously referenced, "[t]he *de facto* doctrine was ingrafted upon the law some five hundred years ago <u>as a matter of policy and necessity</u> to protect the interests of the public and

individuals involved in official acts of a person exercising the duty of an officer without actually being one in strict point of law." Sherretz, 40 Haw. at 373 (emphasis added). In Carroll, the court explained that "[a]n officer *de facto* is one whose acts, though not those of a lawful officer, the law, upon principles of policy and justice, will hold valid so far as they involve the interests of the public and third persons[.]" 38 Conn. at 471 (emphasis added).

The de facto officer doctrine therefore stems from an assumption that it protects the public. See Ryder, 515 U.S. at 180 (purpose of doctrine is "to protect the public by insuring the orderly functioning of the government despite technical defects in title to office") (quotation marks and citation omitted); Hussey v. Smith, 99 U.S. 20, 24 (1878) ("The acts of such [de facto] officers are held to be valid because the public good requires it. The principle wrongs no one.") (emphasis added).

Consequently, while the OHA/Carroll categories establish the outer parameters for the application of the de facto officer doctrine, public interest is clearly a significant factor to consider when applying the doctrine. In this case, the public interest is not served by validating Kanuha's actions through an application of the de facto officer doctrine. The LUC's consideration of the Reclassification Petition was a matter of great importance to the community, as it involved the proposed

reclassification and long-term development of land in Waipiʻo and Waiawa from an agricultural to urban district.

The LUC's role in this process was to consider the impact of the proposed reclassification on areas of state concern, including the maintenance of valued cultural, historical, or natural resources. See HRS § 205-17 (Supp. 2010) (setting forth LUC decision-making criteria); HAR § 15-15-77 (setting forth LUC decision-making criteria for boundary amendments). HRS §§ 205-1 and 205-4 expressly require six of the nine LUC members to vote in favor of any boundary amendment. In 1961 when the land use law was enacted and the LUC was established, the LUC consisted of seven members, and six affirmative votes were required to approve district boundary amendments. 1961 Haw. Sess. Laws Act 187, §§ 2, 6 at 300-01. Comparatively, only five affirmative votes were required for granting special permits. 1961 Haw. Sess. Laws Act 187, § 7 at 302. See 1963 Haw. Sess. Laws Act 205, §§ 1-2 at 315-19 (clarifying Act 187, retaining six vote requirement for boundary amendments and amending special permit approval to require majority approval).

In 1975, the land use law was reformed and the LUC became a nine-member commission. 1975 Haw. Sess. Laws Act 193, §§ 1-2 at 441. The original bill did not propose amending HRS § 205-1 to require six affirmative votes for any boundary amendment. H.B. 1870, 8th Leg., Reg. Sess. (1975). The conference committee amended the bill to add the six affirmative

votes requirement to HRS § 205-1.  H.B. 1870, H.D. 1, S.D. 3, C.D. 1, 8th Leg., Reg. Sess. (1975).  The committee explained that the purpose of the amendment was to "make it express that six affirmative votes are required for the Commission to amend any land use district boundary," in order to "bring[] the bill into conformity with the existing provision of the land use law in this regard."  Conf. Comm. Rep. No. 23, in 1975 House Journal, at 890.

Thus, the legislature has always been particularly concerned with the LUC's approval of district boundary amendments and has retained the six-vote requirement throughout the history of the land use law because of the importance of such amendments. It is manifest that the legislature intended for the six required votes to be cast by individuals who <u>qualified</u> under the law to serve as LUC commissioners.  The legislature would not have contemplated that the prescribed number of votes required for a boundary amendment could be compromised by an unqualified LUC member's participation in voting.

In addition, the LUC is required under article XII, section 7 of the Hawaiʻi Constitution to "preserve and protect customary and traditional practices of native Hawaiians."[19]  <u>Ka Paʻakai O KaʻAina v. Land Use Comm'n</u>, 94 Hawaiʻi 31, 45, 7 P.3d

---

[19]    The constitutional provision provides: "The State reaffirms and shall protect all rights, customarily and traditionally exercised for subsistence, cultural and religious purposes and possessed by ahupua a tenants who are descendants of native Hawaiians who inhabited the Hawaiian Islands prior to 1778, subject to the right of the State to regulate such rights." Haw. Const. art. XII, § 7.

1068, 1082 (2000).  Consistent with this constitutional provision, HRS § 205-1 requires one member of the LUC to have "substantial experience or expertise in traditional Hawaiian land usage and knowledge of cultural land practices."

At least some members of the Senate rejected Kanuha's nomination for a second term based on their belief that Kanuha was being nominated to serve as the designated member and that Kanuha was not qualified for the position because of his limited knowledge and experience in traditional Hawaiian land usage.  See 2010 Senate Journal, at 561-62 (remarks by Senators Hee and Hemmings).  Senator Hemmings stated that the Senate had "no choice but to vote 'no'" on Kanuha's nomination "in order to stay compliant" with HRS § 205-1.  Id. at 564.

Under these circumstances, it is apparent that the public's interest is not protected by giving de facto validity to Kanuha's votes.  Rather, the public good is served when the applicable statutes are followed, in order to ensure that the individuals who are deciding whether the project should be approved are actually qualified under the law to render such a decision.  Allowing a disqualified commissioner to participate in the LUC's consideration of a petition has the effect of undermining the Senate's advice and consent power and undermining the laws the legislature and the LUC itself specifically put in place on behalf of the public.  See HRS § 205-1 (requiring six affirmative votes for any boundary amendment and requiring a member with expertise in Hawaiian land usage and cultural land

practices); HRS § 205-4(h) (requiring six affirmative votes for any boundary amendment); HAR § 15-15-13(a) (requiring LUC to have six affirmative votes to approve boundary amendments under HRS § 205-4).

The public interest in having six valid, qualified votes determine the Reclassification Petition, in having an LUC member who has the requisite expertise and experience in Hawaiian land usage, and in having the Senate's input in reviewing and appointing LUC members, are undermined and frustrated by giving de facto validity to Kanuha's actions.

Second, a stated purpose of the de facto doctrine is its intent to facilitate government efficiency. 63C Am. Jur. 2d § 23 ("the doctrine's purpose is to . . . ensure the orderly administration of government by preventing technical challenges to an officer's authority"); Norton, 118 U.S. at 441-42 ("[P]rivate parties are not permitted to inquire into the title of persons . . . in apparent possession of their powers and functions . . . . It is manifest that endless confusion would result if in every proceeding before such officers their title could be called in question."). Permitting challenges to the actions of public officials based on the mere potential of technical shortcomings in an officer's authority such as the failure to take an oath or to furnish payment would adversely impact the orderly functioning of government.

In this case, however, the Sierra Club's challenge to Kanuha's participation in the Reclassification Petition

proceedings was based on the knowledge that the Senate had rejected Kanuha's nomination for a second term. It was not based on the type of unlimited conjecture that the doctrine is intended to protect against. Additionally, the Sierra Club filed its Motion to Disqualify with the LUC prior to the LUC's votes on the Reclassification Petition, rather than waiting for the outcome of the vote to challenge Kanuha's participation. See Glidden Co. v. Zdanok, 370 U.S. 530, 535 (1962) (de facto officer doctrine is intended to "prevent[] litigants from abiding the outcome of a lawsuit and then overturning it if adverse upon a technicality of which they were previously aware").

Thus the dual purposes of the de facto officer doctrine, "to protect the public's reliance on an officer's authority and to ensure the orderly administration of government," 63C Am. Jur. 2d § 23, are not served by applying the doctrine in this case. This case is not one in which the "public good requires" that Kanuha's actions be held valid, Hussey, 99 U.S. at 24 (emphasis added). On the contrary, applying the doctrine to validate Kanuha's actions with respect to the Reclassification Petition would have the effect of harming the public's interest, which is protected when qualified public officials deliberate on matters of public significance. The interests of the public and third persons require Kanuha's actions to be invalidated as those of a disqualified officer.

IV.

The invalidation of Kanuha's actions with respect to the Reclassification Petition raises the question of whether the LUC's approval of the petition must also be invalidated.

As stated, the Reclassification Petition proposed amending the land use district boundary to reclassify 767 acres of land.  The Reclassification Petition was filed pursuant to HRS § 205-4 and HAR § 15-15.  On September 23, 2010, the LUC voted to approve the Reclassification Petition by a vote of 7-1, with Kanuha voting in favor of approval and one commissioner being excused.  Subsequently on October 15, 2010, the LUC voted to approve the Decision and Order by a vote of 6-0, with Kanuha voting in favor of approval.

HRS § 92-15 (1993) provides that when "the number of members necessary to validate any act . . . is not specified . . . in any other law or ordinance, . . . the concurrence of a majority of all the members to which the board or commission is entitled shall be necessary to make any action of the board or commission valid."  (Emphasis added).  In this case, the relevant statutes and rules expressly provide that six affirmative votes are required for the LUC's approval of any boundary amendment.

HRS § 205-4(h) (Supp. 2010) provides that "[s]ix affirmative votes of the commission shall be necessary for any boundary amendment" to land areas greater than fifteen acres.  See HRS § 205-1 (Supp. 2010) ("Six affirmative votes shall be necessary for any boundary amendment.").  HAR § 15-15-13(a) (2000), governing the LUC's rules for quorum and number of votes

-49-

necessary for a decision, confirms that "unless otherwise provided by law, . . . the concurrence of a majority of all the members to which the commission is entitled shall be necessary to make a commission decision valid <u>provided all approvals of petitions for boundary amendments under section 205-4, HRS, shall require six affirmative votes</u>[.]"  (Emphasis added).  Thus, HRS § 92-15 is not applicable.  Without Kanuha's disqualified vote, the LUC lacked the requisite six affirmative votes to approve the Decision and Order on October 15.

The LUC and Castle & Cooke, however, argued to the ICA that HRS § 92-15 was applicable to the LUC's approval of the Decision and Order because the October 15 vote "was an administrative or ministerial act to memorialize the LUC's approval vote on September 23, 2010, and not [part of] the district boundary amendment action[.]"

There is no merit to the argument that the LUC's vote to approve the Decision and Order was not part of the LUC's decision on the Reclassification Petition.  Rather than constituting a mere ministerial act rubber-stamping the LUC's September 23 vote, the Decision and Order was statutorily required and constituted an integral part of the LUC's decision to approve the boundary amendment requested in the Reclassification Petition.

Under HRS § 205-4(g) (2001), the LUC is required to approve, deny, or modify a petition for a district boundary amendment involving land areas greater than fifteen acres "by

-50-

filing findings of fact and conclusions of law":

> [T]he commission, <u>by filing findings of fact and conclusions of law</u>, shall act to approve the petition, deny the petition, or to modify the petition by imposing conditions necessary to uphold the intent and spirit of this chapter or the policies and criteria established pursuant to section 205-17 or to assure substantial compliance with representations made by the petitioner in seeking a boundary change.

(Emphasis added).  Accordingly, as the circuit court ruled in this case, the act of "filing findings of fact and conclusions of law" is not only part of the LUC's deliberation on the boundary amendment, it is the <u>final act</u> required for the LUC to approve, deny, or modify the petition at issue.

Consistent with this requirement, HAR § 15-15-36(a) (2000), entitled "Decisions and orders," provides that "All decisions and orders for boundary amendment and special permit applications shall be signed by the chairperson or the commissioners who have heard or examined the evidence in the proceeding and have voted affirmatively on the decision." Additionally, "[u]nless otherwise indicated in the order, the effective date of a decision and order shall be the date of service."  HAR § 15-15-36(b).  Thus, the LUC's own rules indicate that the LUC's decision on a boundary amendment is made final and effective only after the Decision and Order is signed and served.

Moreover, in <u>Life of the Land, Inc. v. West Beach Development Corp.</u>, 63 Haw. 529, 534, 631 P.2d 588, 592 (1981), the court held that the LUC's oral denial of a party's intervention in a commission hearing was not a final decision triggering the statute of limitations for an appeal.  The court

interpreted an LUC rule containing substantially the same language as HAR § 15-15-36(b), and explained that "the Commission by its own rules expressly requires that its decisions be in writing, signed, and are to be effective as of the date of service."[20] Id. Thus, the court held that the statute of limitations "did not begin [to run] until after the date of service of the duly signed written order" upon the party. Id.

Consequently, under HRS § 205-4 and HAR § 15-15-36(a), an LUC decision on a boundary amendment petition is not final until the findings of fact, conclusions of law and decision and order are filed and served. The LUC's October 15 vote to approve the Decision and Order in this case was therefore clearly part of the LUC's approval of the requested boundary amendments. Thus, based on a plain reading of HRS § 205-4, six affirmative votes were required for the LUC to adopt the Decision and Order. Absent Kanuha's disqualified vote, only five members voted to approve the Decision and Order.

In addition, the LUC and Castle & Cooke's attempt to devalue the importance of the Decision and Order in this case is

---

[20]    The court interpreted Land Use Commission Rule 1-4(6), providing:

1-4(6) Decisions and Orders. All decisions and orders shall be signed by the Commissioners who have heard and examined the evidence in the proceeding. Commission members who have not heard and examined all of the evidence may vote and sign only after the procedures set fort in section 91-11, HRS, have been complied with.
(a)    Effective Date. Unless otherwise indicated in the order, the effective date of a decision and order shall be the date of service.

Life of the Land, Inc., 63 Haw. at 534 n.4, 631 P.2d at 592 n.4.

unsupported by the facts.  At the September 23 LUC meeting, Chairman Devens explained that the "objective" of the meeting was "to determine by way of motion the Commission's decision on whether to grant in whole . . . or in part Petitioner's request to reclassify the subject property or to deny the Petition and if granted, what conditions of approval to impose."  The Chairman further explained that if a decision was reached at the meeting, staff would "draft appropriate findings of fact, conclusions of law and decision and order reflecting the Commission's decision," which would then be "further deliberated at the next meeting." (Emphasis added).

Consistent with the Chairman's instructions, during the September 23 meeting, Commissioner Chock expressed his understanding that the LUC would deliberate on "key" conditions of approval at a later date: "Some of the key issues that were raised in terms of traffic and agriculture I think are very important items that we can get a little further into when we deliberate on conditions."  He further stated that he would "reserve the rest of my comments until we get into that specific discussion."  After the LUC's vote to approve the Reclassification Petition, Chairman Devens directed the staff "to draft the appropriate findings of fact, conclusions of law that will be hashed out at the next meeting."  (Emphasis added).

The resulting Decision and Order contains 279 findings of fact, 10 conclusions of law, and 29 conditions to the reclassification and incremental redistricting of the land at

issue.  During the October 15, 2010 LUC meeting, the
commissioners suggested amendments to the conditions of approval
as well as to the findings of fact.[21]  These amendments had not
previously been discussed at the September 23 meeting.  There is
no indication in the record that any Commissioner was <u>required</u> to
vote to approve the Decision and Order based on their vote at the
prior meeting.  Rather, the record demonstrates that the October
15 deliberations were a critical component of the LUC's decision
to approve the Reclassification Petition and were not simply
ministerial in nature.  The October 15 vote to approve the
Decision and Order thus concerned a boundary amendment and was
required to be approved by six affirmative votes.  Pursuant to
Kanuha's disqualification, the boundary amendment only received
five affirmative votes.[22]

The circuit court therefore correctly determined that
the LUC did not have the requisite six affirmative votes to
approve the Reclassification Petition.  Pursuant to HAR § 15-15-
13(b), findings of fact, conclusions of law, and a decision and

---

[21]    See <u>supra</u> note 6.

[22]    In light of our disposition, we do not address the validity of the
LUC's vote at the September 23, 2010 meeting.  <u>Compare</u> <u>Waikiki Resort Hotel,
Inc. v. City & Cnty. of Honolulu</u>, 63 Haw. 222, 249, 624 P.2d 1353, 1371 (1981)
("We know of no reason, in the present case, why the invalid vote of one
member of the council should be held to invalidate the perfectly legal vote of
the other members.") (quoting <u>Marshall v. Ellwood City Borough</u>, 41 A. 994 (Pa.
1899)), <u>with</u> <u>Liberty Dialysis-Hawaiʻi, LLC v. Rainbow Dialysis, LLC</u>, 130
Hawaiʻi 95, 126, 306 P.3d 140, 171 (2013) (Acoba, J., concurring and
dissenting, with whom Pollack, J., joins) ("The actual contribution of any
particular decision maker cannot be measured with precision, but frequently
extends significantly beyond the actual vote cast. . . . [A] significant
threat to accuracy can exist even when a particular vote was numerically
unnecessary for the decision.") (quotation marks and citation omitted).

order <u>denying</u> the Reclassification Petition should have been filed by the LUC.[23]  Therefore, the circuit court properly reversed the Decision and Order of the LUC.

V.

Based on the foregoing, the ICA gravely erred in concluding that Kanuha was a valid holdover member when he participated and voted on the Reclassification Petition.  The Senate's rejection of Kanuha's nomination for a second term disqualified Kanuha from serving as a holdover member under HRS § 26-34(b).  Kanuha's actions taken with respect to the Reclassification Petition are therefore invalid.  His actions are not validated as those of a de facto officer because Kanuha does not qualify as a de facto officer under the four categories identified by this court in <u>OHA</u>.  Inasmuch as the de facto officer doctrine only validates the acts of a de facto officer "so far as they involve the interests of the public and third persons," <u>Carroll</u>, 38 Conn. at 471, the application of the doctrine in this case would also be contrary to the doctrine's purpose.  Kanuha's actions taken after his disqualification from serving as a holdover member are therefore invalid.

Because Kanuha was disqualified from participating in the Reclassification Petition proceedings following the Senate's rejection, the LUC lacked the six affirmative votes required to

---

[23]    "If the commission's action on a petition for boundary amendment under section 205-4, HRS, fails to obtain six affirmative votes, findings of fact, conclusions of law, and decision and order denying the petition shall be filed by the commission."  HAR § 15-15-13(b).

approve the Reclassification Petition.  Accordingly, the ICA's judgment is reversed, and the circuit court's judgment is affirmed.

| | |
|---|---|
| Robert D. Harris,<br>for petitioner | /s/ Paula A. Nakayama |
| | /s/ Simeon R. Acoba, Jr. |
| Marissa H.I. Luning,<br>for respondent<br>Land Use Commission of the<br>State of Hawai'i | /s/ Sabrina S. McKenna<br><br>/s/ Richard W. Pollack |
| Benjamin M. Matsubara,<br>Curtis T. Tabata, and<br>Wyeth M. Matsubara,<br>for respondent<br>Castle & Cooke Homes Hawai'i,<br>Inc. | |

