**Electronically Filed
Supreme Court
SCAP-16-0000686
18-NOV-2019
07:54 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

HERMINA M. MORITA,
Petitioner/Plaintiff-Appellant,

vs.

THOMAS GORAK and STATE OF HAWAI'I,
Respondents/Defendants-Appellees.

SCAP-16-0000686

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CAAP-16-0000686; S.P. NO. 16-1-0251)

NOVEMBER 18, 2019

NAKAYAMA, McKENNA, POLLACK, AND WILSON, JJ.,
WITH RECKTENWALD, C.J., DISSENTING

OPINION OF THE COURT BY POLLACK, J.

In accordance with the structure of our political system, the appointment of many government officials is a shared responsibility of the executive and legislative branches. The governor is entitled to choose a nominee for such positions, but the nominee typically may not take office until the senate has

voted to confirm the individual, thus ensuring the appointment is generally agreeable to both elected branches.

Balanced against these political considerations are the practical realities of ensuring the day-to-day operations of public institutions. Governmental agencies may experience difficulties fulfilling their duties when offices that are necessary for their administrative functioning are left vacant. To protect against disruption, the Hawai'i Constitution permits the governor to make interim appointments to offices that require senate confirmation when a vacancy arises and the senate is not in session. Additionally, the legislature has statutorily provided for certain office holders to continue their service as a "holdover" official following the expiration of their term, remaining in office until their successor is appointed.

This case presents a question as to the interaction of these provisions: is the governor entitled to make an interim appointment when the term of an official who is statutorily permitted to holdover expires and the senate is not in session? Because there is no indication in the language or the legislative history of the holdover statutes to limit the governor's authority to make interim appointments and the statutes would be constitutionally suspect if the legislature intended to achieve such an outcome, we conclude that the

governor is permitted to make an interim appointment under these circumstances.

## I. BACKGROUND

### A. Facts

The facts in this case are undisputed.[1]  Prior to June 30, 2016, the Hawai'i Public Utilities Commission (PUC) was composed of three commissioners: Randall Iwase, Lorraine Akiba, and Michael Champley.  Champley's term as commissioner was scheduled to expire on June 30, 2016.  The 2016 legislative session ended on May 5, 2016, without Governor David Ige submitting a nomination for a new commissioner to replace Champley to the Senate for confirmation.

On June 21, 2016, Governor Ige sent Champley a letter informing him of the imminent expiration of his term and thanking him for his service.  Champley responded in a letter dated June 28, 2016, stating that he intended to continue to serve as a "holdover" commissioner until his successor was appointed and confirmed by the senate pursuant to Hawai'i Revised Statutes (HRS) § 269-2(a) (2007).  Nevertheless, Governor Ige announced the following day that he intended to exercise the governor's constitutional authority to temporarily fill

_____

[1]     After the filing of the Complaint, the parties filed Joint Stipulated Facts, which detail the events leading to the current suit.

vacancies that occur while the senate is in recess to appoint Thomas Gorak to replace Champley following the expiration of Champley's term.  Gorak was sworn in as commissioner on an interim basis on July 1, 2016.

### B. Circuit Court Proceedings

On July 15, 2016, Hermina Morita, a member of a public utility cooperative that is regulated by the PUC, filed a complaint and quo warranto petition (Complaint) against Gorak and the State of Hawai'i in the Circuit Court of the First Circuit (circuit court).[2]  The Complaint alleged that since Gorak was sworn in, he had wrongfully occupied the office of the commissioner of the PUC because Champley was still the lawful officeholder until his successor was confirmed by the senate. Quoting HRS § 269-2, the Complaint stated that "[e]ach member [of the PUC] shall hold office until the member's successor is appointed and qualified."  The Complaint pointed to language included in a 1980 Hawai'i Attorney General Opinion to argue that no vacancy exists at the expiration of an incumbent's term when a statute allows the incumbent to continue in office until a successor is appointed.  (Citing Op. Att'y Gen. No. 80-4 (1980).)  Thus, the Complaint alleged, because no vacancy

_____

[2]     The Honorable Edwin C. Nacino presided.

4

existed, the interim appointment power of the governor was not implicated. (Citing Op. Att'y Gen No. 80-4, at 2.)

The Complaint contained four counts of relief, though only two are relevant in this appeal.[3] Count I sought an order pursuant to HRS § 659-6 (2016)[4], the quo warranto statute, declaring that Gorak did not properly hold the office of PUC commissioner and prohibiting him from further performing any of the post's official duties.[5] Count III sought a declaratory judgment as to whether Gorak lawfully held the office of PUC commissioner.

The State and Gorak (collectively, Gorak) filed a joint Answer denying that Gorak wrongfully occupied or usurped the office of PUC commissioner and that Champley was the lawful

---

[3] The parties stipulated to the dismissal of Count II ("Common Law Quo Warranto" against Gorak) and Count IV ("Private Attorney General Doctrine" against the State) of the Complaint without prejudice.

[4] HRS § 659-6 provides the following in relevant part:

[(a)] If a person to whom an order is directed with respect to an office of which the person performs the duties does not answer within the time allowed or the answer is insufficient or it is found that the person has usurped the office or continues in it unlawfully, the court in addition to declaring the person not qualified to fill the office and forbidding the person to perform the duties of the office any longer, may direct that a new appointment be made and may grant other appropriate relief.

[5] The parties stipulated to the issuance of an order of quo warranto, which directed Gorak to file an answer to the Complaint and to "state the authority under which" he "claim[ed] to act as a Commissioner" of the PUC.

officeholder.[6]  On the same day that Gorak filed his Answer, he also filed a Motion for Summary Judgment arguing that he was properly appointed as a commissioner of the PUC under the interim appointments provision of the Hawaiʻi Constitution, which authorized the governor to fill a vacancy in any office when the senate is not in session.  Gorak contended that this provision, contained in article V, section 6 of the Hawaiʻi Constitution, did not include the phrase "as provided by law," and the interim appointment power was therefore self-executing; that is, it could be exercised on its own without any requirement for implementing legislation.  (Citing State v. Rodrigues, 63 Haw. 412, 414, 629 P.2d 1111, 1113 (1981).)  As a result, Gorak asserted, the governor's interim appointment authority was subject only to the limitations stated in the constitutional provision itself, and any statutes touching upon interim appointments are effective only if consistent with the provision.

The statute in dispute in this case, Gorak stated, was HRS § 269-2, which provides that "[e]ach member [of the PUC] shall hold office until the member's successor is appointed and

---

[6]     Gorak admitted that an "actual controversy" existed regarding whether Gorak was properly appointed and qualified so as to end Champley's term on July 1, 2016.

qualified."[7]  This statute allows, though does not require, a member of the PUC to continue to serve in the position after the expiration of the member's term as a "holdover," Gorak explained.  But, Gorak argued, this statute cannot be interpreted to circumvent the governor's interim appointment authority.  Therefore the statute cannot prevent a vacancy from occurring upon the expiration of a term, Gorak contended; otherwise the governor's constitutional authority would be "substantially--and in individual cases, completely--undercut" as it would allow the legislature to define when the governor can exercise a power that the constitution granted solely to the governor.  Defining "vacancy" to include the end of a set term is consistent with the authorities granted to the governor in the Hawai'i Constitution, Gorak asserted.  Accordingly, Gorak concluded that the expiration of Champley's term constituted a

---

[7]  Gorak argued that it was significant that the statute uses the word "qualified" rather than the phrase "confirmed by the senate," which is used in similar statutes.  (Citing HRS §§ 302A-123 (Supp. 2016), 304A-104 (Supp. 2016).)  Because the legislature chose to use a different term in HRS § 269-2(a), Gorak contended, the court should presume that the difference is intentional and give the difference effect when construing the statute. (Citing Agustin v. Dan Ostrow Const. Co., 64 Haw. 80, 83, 636 P.2d 1348, 1351 (1981).)  "Qualified," Gorak contended, means the governor has reviewed the appointee's qualifications and the appointee has taken the oath of office, whereas "confirmation" is a function of the senate that is used for full-term appointments.  (Citing Haw. Const. art. XVI, § 4; Haw. Const. art. V, § 6; Sierra Club v. Castle & Cooke Homes Hawai'i, Inc., 132 Hawai'i 184, 192, 320 P.3d 849, 857 (2013).)

"vacancy" that Governor Ige could fill using his interim appointment power.[8]

Morita responded by filing a consolidated Cross-Motion for Partial Summary Judgment (cross-motion) and opposition to Gorak's motion, arguing that the Hawai'i Constitution only grants the governor the interim appointment power when there is a "vacancy," and the term "vacancy" means only an office that is unoccupied or empty. (Citing Office of Hawaiian Affairs v. Cayetano, 94 Hawai'i 1, 6 P.3d 799 (2000).) Here, Morita contended that there was no "vacancy" for which Governor Ige could utilize his interim appointment power because Champley did not resign and was not otherwise removed from office. Morita also argued that the meaning of "vacancy" necessarily derives from statutory authority because the Hawai'i Constitution is silent as to the duration of a PUC commissioner's term. Under HRS § 269-2(a), Morita asserted, there was not a vacancy because Champley was entitled to hold the commissioner position until Champley's successor was confirmed by the senate--a necessary legal requirement to be "qualified" as a commissioner of the PUC under the statute. Thus, Morita concluded that the governor's

---

[8]    Regarding declaratory relief, Gorak also argued that Morita lacked standing because the Complaint made no allegations on which a "distinct and palpable" injury to Morita could be based and "[a]ny such allegation would likely be based on speculation and conjecture in any event." (Citing Hanabusa v. Lingle, 119 Hawai'i 341, 347, 198 P.3d 604, 610 (2008).)

interim appointment power was not implicated because there was not an actual vacancy at the time of Gorak's appointment.[9]

Pursuant to the parties' stipulation, the Hawaiʻi State Senate filed an amicus curiae brief in support of Morita. Included as exhibits to the brief were two attorney general opinions. The first was the 1980 letter cited by the Complaint, Opinion 80-4, which was issued in response to inquiries by the chairman of a senate committee regarding the length of time a holdover official is authorized to continue serving if the official's nomination for a second term is rejected by the senate. In explaining the operation of a holdover statute, the opinion stated the following:

> Where a statute specifies that the incumbent shall continue to hold office until his successor is appointed and qualified, it is well settled that the incumbent retains his office as a de jure officer and no vacancy exists at the expiration of the incumbent's term. Therefore, the interim appointment power of the governor is not activated.

Op. Att'y Gen. No. 80-4, at 2.

Also attached to the amicus curiae brief was a second, more recent attorney general opinion. In response to questions posed by the Senate President following Gorak's ostensible interim appointment, the attorney general issued Opinion 16-3, which concluded that "the Governor is authorized by article V,

---

[9] Morita argued that she had standing to obtain declaratory relief because she suffered an injury in fact as a result of the State wrongfully paying Gorak's salary using funds she contributed to as taxpayer.

section 6 of the Hawai'i Constitution to appoint a successor member to the PUC when the term of the incumbent member expires, and irrespective of whether the incumbent continues to serve as a holdover member." Op. Att'y Gen. No. 16-3, at 1 (2016). The opinion "acknowledge[d] that some portions of Attorney General Opinion No. 80-4 included statements that indicated otherwise." Id. The opinion stated, however, that "those issues were not central to the issue resolved in that opinion and are superseded by the analysis offered here." Id.

The Senate asserted in its brief that the conflicting attorney general opinions exemplified the actual controversy at issue in the case. The latter opinion misinterpreted article V, section 6, the Senate argued, by ignoring the different ways in which the Hawai'i Constitution provides for the appointment and removal of single executive department heads, members of boards and commissions that head principal departments, and all other officers that require senate confirmation. The constitution makes only single executive department heads removable at the governor's discretion, the Senate contended. By contrast, the terms of office and removal of department-head commission members and all other officers requiring senate confirmation are set by statute, the Senate continued, and the governor cannot use the interim appointment power to circumvent the requirements the legislature has prescribed.

10

In a consolidated reply to Morita and the Senate's respective filings, Gorak reiterated the arguments from his motion, stating that the legislature may define a "vacancy" only if it does so in a manner consistent with the grant of power in article V, section 6 of the Hawai'i Constitution. Morita's interpretation of "vacancy" under HRS § 269-2, Gorak contended, impermissibly limited the governor's constitutional interim appointment power and threatened the balance between the executive and legislative branches of government.

The circuit court granted Gorak's Motion for Summary Judgment and denied Morita's cross-motion. The court found that "Champley's term of office . . . expired on June 30, 2016, and that a vacancy occurred for purposes of article V, section 6 of the Hawai'i Constitution upon the expiration of Mr. Champley's term of office." Therefore, the court concluded that "Governor Ige's interim appointment of Mr. Thomas Gorak as a commissioner on the PUC when the Senate was not in session was valid."[10] Counts I and III were accordingly dismissed without prejudice. On October 17, 2016, Morita filed a timely notice of appeal challenging the circuit court's Final Judgment in Favor of

---

[10] The court also found that Morita failed to establish that she had standing to obtain declaratory relief.

Respondent-Defendants Thomas Gorak and the State of Hawai'i and Against Petitioner-Plaintiff Hermina M. Morita (judgment).

### C. Subsequent Events

On March 28, 2017, during the course of briefing before the Intermediate Court of Appeals (ICA), Governor Ige submitted Gorak's interim appointment as PUC commissioner to the Senate for confirmation. 2017 Senate Journal, at 396 (Gov. Msg. No. 703); see also Gov. Msg. No. 703, 29th Leg., Reg. Sess. (2017).[11] One month later, the Senate voted to reject Gorak's confirmation. 2017 Senate Journal, at 591-94. Following the close of the 2017 regular legislative session, Governor Ige again invoked his interim appointment powers to name James P. Griffin as PUC commissioner on an interim basis. Press Release, Hawai'i Governor's Office, Governor Ige Appoints UH Faculty Member, Researcher James Griffin to Public Utilities Commission (May 19, 2017).[12] Thereafter, Governor Ige submitted Griffin's appointment to the Senate during a special session for confirmation, and Griffin was unanimously confirmed by the

---

[11]   https://www.capitol.hawaii.gov/Archives/measure_indiv_Archives.aspx?billtype=GM&billnumber=703&year=2017 [https://perma.cc/VGG9-A98U].

[12]   https://governor.hawaii.gov/newsroom/governors-office-news-release-governor-ige-appoints-uh-faculty-member-researcher-james-griffin-to-public-utilities-commission/ [https://perma.cc/857Q-FAAY].

Senate on August 31, 2017.[13]  2017 Senate Journal, Spec. Sess.,

at 1 (Gov. Msg. No. 3); id. at 40.  Although it had participated

as amicus curiae before the trial court, the Senate made no

further filings or appearances throughout the appeal of this

case.

After the close of briefing, Morita filed an

application for transfer to this court, arguing that the case

involved a matter of fundamental public importance that turned

on a novel question of law.  Gorak filed a response stating he

had no objection to transfer, and this court accepted Morita's

application on July 19, 2017.

## II. STANDARD OF REVIEW

This court reviews questions of constitutional law de

novo under the "right/wrong" standard.  State v. Sasai, 143

Hawaiʻi 285, 294, 429 P.3d 1214, 1223 (2018); State v. Arceo, 84

Hawaiʻi 1, 11, 928 P.2d 843, 853 (1996).

## III. DISCUSSION

Article V, section 6 of the Hawaiʻi Constitution

empowers the governor to make interim appointments to offices

---

[13]    Although the Senate's rejection of Gorak's confirmation and Griffin's subsequent appointment and confirmation is not in the record, we have the discretion to take judicial notice of such matters under Hawaiʻi Rules of Evidence (HRE) Rule 201 (2016) as "it is a matter of public record and easily verifiable."  Williams v. Aona, 121 Hawaiʻi 1, 11 n.6, 210 P.3d 501, 511 n.6 (2009).

that require senate confirmation when a vacancy arises in such office and the senate is not in session.  Rather than following the typical procedure, under which the governor nominates an individual who takes office for a full term if the senate votes to confirm the nominee, an interim appointee may be sworn into office at the time the appointment is made effective, and the senate may thereafter vote to confirm the interim appointment. Haw. Const. art. V, § 6.  If the senate declines to do so, the interim appointment expires at the end of the next legislative session.  Id.

The constitution itself requires senate confirmation for the appointment of the heads of principle executive departments, but the governor's interim appointment power is not limited to these offices.  It applies when there is a vacancy in "any office, appointment to which requires the confirmation of the senate," including those that the legislature has chosen to statutorily condition appointment on senate confirmation.  See id.  The legislature has so conditioned appointment to the office of PUC commissioner, which is established by HRS § 269-2. HRS § 269-2(a) states in relevant part, "There shall be a public utilities commission of three members, to be called commissioners, and who shall be appointed in the manner prescribed in section 26-34, except as otherwise provided in this section."  HRS § 26-34(a) (2009) in turn provides that

"[t]he members of each board and commission established by law shall be nominated and, by and with the advice and consent of the senate, appointed by the governor." There is accordingly no dispute that the governor is entitled to exercise the interim appointment power if a vacancy occurs on the PUC when the senate is not in session.

This case instead turns on when the office of PUC commissioner may be considered vacant for purposes of the interim appointment power.[14] Under HRS § 269-2(a), "[a]ll members [of the PUC] shall be appointed for terms of six years each," and "[e]ach member shall hold office until the member's successor is appointed and qualified." A PUC commissioner thus typically serves for a designated term,[15] then continues to hold

_____

[14] As a threshold matter, Morita preemptively argues that any concerns about mootness may be overcome by the public interest exception to the doctrine that this court has recognized. This court has stated that we may decide the merits of a case in which we cannot order the requested relief if there are public interests at stake and the question at the heart of the case is likely to recur, making an authoritative determination of the legal issues involved desirable for the future guidance of public officers. Wong v. Bd. of Regents, 62 Haw. 391, 395-96, 616 P.2d 201, 204 (1980) (quoting Johnston v. Ing, 50 Haw. 379, 381, 441 P.2d 138, 140 (1968)). PUC commissioners make important decisions regarding public utilities, and their terms of office routinely expire after the last day of the regular legislative session. A conflict over the governor's authority to make an interim appointment during a commissioner's holdover service is thus likely to recur, and it is in the public interest that this court resolves this case. We thus agree that a mootness argument would easily be dispensed with because this case would fall into the public interest exception in any event.

[15] Although HRS § 269-2 states that a commissioner's term shall be six years, HRS § 26-34(c), which applies to the PUC when HRS § 269-2 does not provide otherwise, specifies that "[a] vacancy occurring in the membership of any board or commission during a term shall be filled for the unexpired term thereof, subject to Article V, section 6 of the Constitution of the State."

(continued . . .)

office as an out-of-term "holdover" until the commissioner's successor is appointed and qualified. If the office of PUC commissioner was vacant during the commissioner's out-of-term holdover service, Governor Ige was authorized to exercise his interim appointment power following the June 30, 2016 expiration of Champley's term, making his appointment of Gorak lawful. If the PUC holdover provision precludes a vacancy, however, Gorak could not be lawfully appointed to the position.

"The doctrine of 'constitutional doubt,' a well-settled canon of statutory construction, counsels that 'where a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is [to] adopt the latter.'" In re Doe, 96 Hawai'i 73, 81, 26 P.3d 562, 570 (2001) (quoting Jones v. United States, 529 U.S. 848, 857 (2000)). We therefore begin by considering the text and history of the interim appointments clause and the role it plays within the constitutional balance of power to determine whether an interpretation of the holdover provisions that prevents a vacancy from arising would be constitutionally permissible. We

_____

(. . . continued)

Consequently, when Champley was appointed following his predecessor's resignation, his term was scheduled to expire six years from his predecessor's original appointment rather than six years from his own. No party has argued that HRS § 26-34(c) is inconsistent with HRS § 269-2.

then turn to the language, structure, and legislative history of

HRS §§ 26-34 and 269-2 to determine whether the holdover

provisions were in fact intended to prevent a vacancy from

arising.

**A. The Holdover Provisions Would Be Constitutionally Suspect if Interpreted to Preclude a Vacancy for Purposes of the Governor's Interim Appointment Power**

**1. By Its Terms, the Interim Appointment Power Is Self-Executing and Not Subject to Statutory Limitations**

The interim appointments clause of article V, section

6 of the Hawai'i Constitution states in relevant part as follows:

> When the senate is not in session and a vacancy occurs in any office, appointment to which requires the confirmation of the senate, the governor may fill the office by granting a commission which shall expire, unless such appointment is confirmed, at the end of the next session of the senate.

Notably, the clause does not contain the phrase "as provided by

law," which is included in a number of other provisions in the

constitution that govern appointments. For example, article X,

section 2 states that "[t]he governor shall nominate and, by and

with the advice and consent of the senate, appoint the members

of the board of education, as provided by law." (Emphasis

added.) Similarly, article X, section 6 provides that the

members of the Board of Regents of the University of Hawai'i

"shall be nominated and, by and with the advice and consent of

the senate, appointed by the governor from pools of qualified

candidates presented to the governor by the candidate advisory

17

council for the board of regents of the University of Hawaii, <u>as provided by law</u>." (Emphasis added.)

The omission is significant. The phrase "as provided by law" indicates that, as long as it complies with the basic text of the provision, the subject matter "may be dealt with by the Legislature as it deems appropriate." <u>State v. Rodrigues</u>, 63 Haw. 412, 415, 629 P.2d 1111, 1114 (1981) (quoting <u>Agnew v. Schneider</u>, 253 N.W.2d 184, 187 (N.D. 1977)). Its absence in the interim appointments clause suggests the constitution does not contemplate a role for the legislature in prescribing the time and manner in which the governor may make interim appointments.

This impression is strengthened by article XVI, section 16 of the Hawai'i Constitution, which requires this court to interpret constitutional provisions to "be self-executing to the fullest extent that their respective natures permit." To fulfill this mandate, we set forth the test for identifying a self-executing constitutional provision in <u>State v. Rodrigues</u>, 63 Haw. at 414, 629 P.2d at 1113. Adopting the standard articulated by the United States Supreme Court, we stated,

> A constitutional provision may be said to be self-executing if it supplies a sufficient rule by means of which the right given may be enjoyed and protected, or the duty imposed may be enforced; and it is not self-executing when it merely indicates principles, without laying down rules by means of which those principles may be given the force of law.

<u>Id.</u> (quoting <u>Davis v. Burke</u>, 179 U.S. 399, 403 (1900)).

18

Under this test, it is clear that the governor's interim appointment power is self-executing. Rather than laying out only general principles and leaving the details to be defined through legislation, the clause outlines definite standards as to when and how the governor may utilize the power. There is thus no doubt that the interim appointment clause carries the force of law on its own accord, and it is axiomatic that a self-executing constitutional provision may not be curtailed or qualified by statute. See State v. Handa, 66 Haw. 82, 84, 657 P.2d 464, 466 (1983) ("[T]he constitution as the highest . . . expression of the law-making power, operates to repeal or supersede . . . all statutes that are . . . inconsistent with the full operation of its provisions." (first alteration in original) (quoting 16 C.J.S. Constitutional Law § 43, at 135)). In sum, the text of the constitution indicates that the governor's constitutional authority to make interim appointments was meant to supersede any restrictions that the legislature might attempt to place upon it.[16]

---

[16] The dissent contends that the self-executing nature of the interim appointments provision is irrelevant because "the provision does not conflict with any statute." Dissent at 18. Holdover provisions that preclude vacancies do not conflict with the governor's interim appointment power, the dissent argues, because "[t]aken to its logical end, this argument cannot support a functioning government because any otherwise-valid law that bears on appointing an officer would in some small way necessarily limit the interim appointments clause by causing the position not to be vacant." Id. The dissent's contention is clearly incorrect. The logical end of our position is that the legislature cannot prevent a vacancy from arising at the

(continued . . .)

## 2. The Constitutional History Demonstrates a Choice by the Delegates to Utilize Interim Appointments Instead of Holdover Service

To the extent the interim appointments clause is ambiguous as to its interaction with a statutory holdover provision, "extrinsic aids may be examined to determine the intent of the framers and the people adopting the proposed amendment." State v. Kahlbaun, 64 Haw. 197, 201-02, 638 P.2d 309, 314 (1981). The committee reports and floor debates of the 1950 constitutional convention during which the clause was drafted make no specific mention of the governor's interim appointment power. But a closer examination of the proposals bearing on executive power indicates that the delegates specifically considered and rejected holdover provisions similar to the ones now appearing in HRS §§ 26-34 and 269-2.

Two proposals bearing on the issue were submitted to the Committee on Executive Powers and Functions when it was

_____

(. . . continued)

end of a legislatively prescribed term. The power of the legislature, for example, to set the dates of terms of office, prescribe the length and number of terms, and provide for the removal of PUC commissioners is unaffected by our conclusion that the legislature cannot preclude vacancies from arising outright, which would substantially constrict the interim appointment power granted by article V, section 6. Whether, and to what extent, the legislature's otherwise lawful authority could constitutionally restrict the governor's interim appointment power is a grave constitutional question. Because the dissent's interpretation of HRS § 269-2 presents that question, and our construction avoids it, "our duty is [to] adopt the latter." In re Doe, 96 Hawaiʻi 73, 81, 26 P.3d 562, 570 (2001) (quoting Jones v. United States, 529 U.S. 848, 857 (2000)). This conclusion is further militated by the absence of any legislative intent that HRS § 269-2 restricts the governor's interim appointment power. See infra Part III.B.2.

drafting the committee proposal that would eventually become article V, section 6 of the Hawai'i Constitution.  The first, proposal 22, was entitled "Appointment, Removal and Tenure of Department Heads and High Governmental Officers."  Proposal No. 22 (April 14, 1950) at 1, in 1950 Constitutional Convention materials, Box 12 (on file with the Hawai'i State Archives).  The proposal provided that

> the members of all boards and commissions of a public character that may be created by law . . . . shall be appointed for terms to expire with the term of the governor, and until their successors are appointed and qualified; provided, that the terms of members of boards and commissions may otherwise expire if so provided by law.

Id. at 1-2 (emphasis added).  Similarly, proposal 176, entitled "A Proposal Relating to Power of Appointment to Fill Vacancies - Tenure of Appointees," stated, "The Governor shall fill all vacancies in public offices unless otherwise provided by this constitution and law, and his appointees shall serve until their successors are duly elected or appointed and qualified."  Proposal No. 176 (May 20, 1950) at 1, in 1950 Constitutional Convention materials, Box 12 (emphasis added) (on file with the Hawai'i State Archives).  But the Committee on Executive Powers and Functions rejected the language from both proposals, and no holdover provision was included in the committee proposal that was ultimately reported to the Committee on the Whole.  See Stand. Comm. Rep. No. 67, 1 Proceedings of the Constitutional Convention of Hawaii of 1950, at 215-22 (1960) (I Proceedings)

21

(containing copy of measure as referred by the Committee on Executive Powers and Functions to the Committee on the Whole).

Instead, the committee proposal included the interim appointments clause as it now appears in article V, section 6 of the Hawai'i Constitution. This suggests a conscious decision on the part of the framers that the composition of a commission following the expiration of a commissioner's term should be determined by the governor when the senate is not in session-- and not by the previous office holder's decision as to whether or not to holdover. And while the legislature may certainly act to ensure these commissions are able to fulfill their administrative functions when the governor has not moved to make such an appointment, the framers do not appear to have intended that the legislature could deprive the governor of this core power.

The dissent maintains that the framers' rejection of the holdover provision does not demonstrate a preference for interim appointments, but instead indicates that the framers intended to leave the application of a holdover provision "open for legislative treatment as future conditions may require." Dissent at 9 (quoting Stand. Comm. Rep. No. 67 in I Proceedings, at 215). However, the language quoted by the dissent does not relate directly to either interim appointments or holdover provisions. Instead, it is a general statement that certain

specified matters should be left open for legislative treatment as required by future conditions.[17]  See Stand. Comm. Rep. No. 67 in I Proceedings, at 215.  Indeed, the very next sentence of Committee Report No. 67, after the passage quoted by the dissent, states the following:

> Your Committee believes that it is only through such delegation to the Legislature that the flexibility necessary to keep government in step with economic and social development is possible.

Id. (emphasis added).  Thus, the drafters of the Committee Report expressly indicated that subjects left "open for legislative treatment" were those that had been delegated to the legislature.  Id.

For example, the Committee stated that "[i]n case of a tie vote or a contested election, the selection of a Governor shall be determined in such manner as may be provided by law."  Id. at 216 (emphasis added).  In regard to the Lieutenant Governor, the Committee stated that the Lieutenant Governor would "perform such duties as may be prescribed by law."  Id. (emphasis added).  The Committee also recommended that the "Legislature by law allocate the usual duties of the Secretary [of State] . . . to the office of Lieutenant Governor."  Id. at

---

[17]  It is noted that the Committee Report relied upon by the dissent also states the following: "The fundamental principle upon which your Committee Proposal was drafted is that of concentration of executive power in the Governor, which would give the best government."  Stand. Comm. Rep. No. 67 in I Proceedings, at 215.

216-17 (emphasis added).  As related to the principal

departments in the executive branch, the Committee stated that

"the number . . . shall be limited to not more than 20 and <u>the</u>

<u>Legislature shall be required to allocate</u> the existing

departments, boards and other agencies among and within the 20 .

. . departments."  <u>Id.</u> at 217 (emphasis added).  In regard to

the leadership of these departments, the Committee recommended

that "[e]ach . . . department shall be headed by a single

executive <u>unless otherwise provided by law</u>."  <u>Id.</u> (emphasis

added).  Significantly, the Committee recommended that the

members of quasi-judicial or quasi-legislative bodies, such as

the PUC, should be protected from removal and that "restrictions

on removal should be provided by law."  <u>Id.</u> at 217.[18]  These

---

[18]    The dissent maintains that because article V, section 6 delegates the manner of removal of PUC commissioners to the legislature, the legislature is empowered to prevent a vacancy from arising on the PUC. Dissent at 5-6.  Thus, the dissent argues, the phrase "[e]ach member shall hold office until the member's successor is appointed and qualified" in HRS § 269-2(a) is in fact a restriction on the governor's ability to remove a holdover PUC commissioner.  Id. at 6-7; HRS § 269-2(a).  First, this case turns on whether the position was "vacant" for the purposes of the interim appointment power, not on the governor's ability to remove PUC commissioners, which the constitution specifies in article V, section 6 shall be provided by law unless otherwise prescribed by the constitution.

Second, the dissent's conclusion that the phrase "shall hold office until the member's successor is appointed and qualified" bears on removal is without basis and inconsistent with the manner in which HRS §§ 269-2 and 26-34 interrelate.  HRS § 269-2(a) provides that PUC commissioners

> shall be appointed in the manner prescribed in section 26-
> 34, except as otherwise provided in this section. . . .
> <u>Section 26-34 shall not apply insofar as it relates to</u> the
> number of terms and consecutive number of years a member

(continued . . .)

examples demonstrate that when the Committee intended to leave a subject open for legislative treatment, it stated as much.

Moreover, all of these express delegations of authority to the legislature are embodied in article V of the Hawai'i Constitution. Not part of the Committee Report, and not included in article V, is a delegation of authority to the legislature that it may provide by law restrictions on the governor's interim appointment power. Thus, it appears clear that the composition of a commission following the expiration of a commissioner's term should be determined by the governor when the senate is not in session as this authority was not "provided by law" to the legislature by article V.

### 3. Interpreting HRS §§ 269-2 and 26-34 To Be Subject to the Interim Appointment Authority Preserves the Constitutional Balance of Power

Under longstanding canons of statutory construction, "if one construction would make it possible for a branch of

---

(. . . continued)

> can serve on the commission; provided that no member shall serve more than twelve consecutive years.

HRS § 269-2(a) (emphasis added).

Notably absent from the listed derogations is removal. This is because the removal of PUC commissioners is governed by HRS § 26-34(d) and not by HRS § 269-2(a). See HRS § 26-34(d) ("The governor may remove or suspend for cause any member of any board or commission after due notice and public hearing."). To read HRS § 269-2(a) as bearing on removal is contrary to the legislature's expressed intent to have HRS § 26-34(d) govern the removal of PUC commissioners.

government substantially to enhance its power in relation to another, while the opposite construction would not have such an effect, the principle of checks and balances would be better served by a choice of the latter interpretation." Staebler v. Carter, 464 F.Supp. 585, 599-600 (D.D.C. 1979). From a functional standpoint, permitting the legislature to preclude a vacancy from arising upon the expiration of a PUC commissioner's term would represent a significant shift in the balance of power between the branches of government.

If, upon the expiration of a PUC commissioner's term, the governor is permitted to make an interim appointment that the legislature disapproves of, the legislature maintains the option of holding a special session in order to swiftly remove the interim office holder by rejecting the temporary appointment or simply adjourning without confirming it. See Haw. Const. art. V, § 6 ("When the senate is not in session and a vacancy occurs in any office, appointment to which requires the confirmation of the senate, the governor may fill the office by granting a commission which shall expire, unless such appointment is confirmed, at the end of the next session of the senate." (emphasis added)); see also Sierra Club v. Castle & Cooke Homes Hawai'i, Inc., 132 Hawai'i 184, 196, 320 P.3d 849, 861 (2013) (rejecting an interpretation of a statutory holdover provision that would allow a previously appointed commissioner

to remain in office after the senate has declined to confirm the member's nomination).

By contrast, were we to allow the legislature to preclude a vacancy from arising upon the conclusion of a commissioner's term, the governor would be without recourse to replace a holdover commissioner if the legislature refuses to confirm a new appointment. A holdover whom the governor does not wish to be in office could therefore serve until at least the end of the second regular legislative session after the expiration of the commissioner's term, and possibly for a full second six-year term.[19]

This court has stated that "the subject of appointment of members to boards and commission must necessarily be considered to be the joint responsibility of the governor and senate." Life of the Land v. Burns, 59 Haw. 244, 251, 580 P.2d 405, 410 (1978). Permitting the legislature to prevent the governor from exercising a constitutional prerogative would represent a substantial diminishment in the executive power

---

[19] HRS § 26-34(b), which applies to the PUC unless HRS § 269-2 provides otherwise, states that "a holdover member shall not hold office beyond the end of the second regular legislative session following the expiration of the member's term of office." HRS § 269-2(a) states that "Section 26-34 shall not apply insofar as it relates to the number of terms and consecutive number of years a member can serve on the commission; provided that no member shall serve more than twelve consecutive years." We need not now decide whether the limitation on holdover service included in HRS § 26-34(b) is consistent with HRS § 269-2 and thus would be applicable to PUC commissioners.

granted by the Hawai'i Constitution, and it is questionable whether our constitution would allow such a rebalancing.

Contrary to the foregoing, the dissent asserts that prohibiting the legislature from precluding a vacancy from arising unduly rebalances power in favor of the governor.  See Dissent at 21-22.  This is because, the dissent argues, terms of office for PUC commissioners always expire when the senate is not in session.  Id. at 22.  The dissent hypothesizes that the governor could "refrain from nominating individuals for senate confirmation while the senate is in session and utilize the interim appointment power instead, wholly depriving the senate of a role in the appointment process."  Id.  First, this ostensible threat is not a product of our interpretation.  As the dissent acknowledges, at the very least a holdover member may not remain in office "beyond the end of the second regular legislative session following the expiration of the member's term of office."  Id. at 22 n.14 (emphasis added) (quoting HRS § 26-34(b)).  And, as the dissent also acknowledges, "[o]nce that period expires, a vacancy in office is created allowing the governor to utilize the interim appointment power if the senate is not in session pursuant to article V, section 6."  Id. at 22-23 n.14.  Thus, the holdover period for PUC commissioners, like the regular term of office, would always expire while the senate is not in session.  Accordingly, even under the dissent's

position, the governor could "deprive the senate of a role in the appointment process."[20]

However, the threat posited by the dissent is illusory. As discussed above, the legislature maintains the option of holding a special session in order to remove the interim office holder. The legislature may remove the interim appointee by rejecting the temporary appointment or by adjourning the special session without confirming the appointee. Haw. Const. art. V, § 6. Rather than revealing a rebalancing of power, the dissent's hypothetical merely demonstrates how the checks and balances embodied in our constitution operate between the branches of government. Furthermore, the expiration of the PUC commissioner's term is set by statute. See HRS § 26-34 ("Unless otherwise provided by law, each term shall commence on July 1 and expire on June 30."). If the legislature determines that the expiration of the term outside of the legislative session leads to executive overreach, it may simply change when the term expires. Haw. Const. art. V, § 6 ("The term of office

---

[20] Additionally, this contended "threat" is not unique to holdovers. If the interim appointment power was limited to vacancies caused by death, incapacity, resignation, or removal that occurred outside of the legislative session and the governor's interim appointee is not confirmed by the senate, the appointee's commission would expire at the end of the next session of the senate. Haw. Const. art. V, § 6 ("[An interim appointee's] commission . . . shall expire, unless such appointment is confirmed, at the end of the next session of the senate."). Thus, even the most constricted view of the interim appointment power poses the purported threat to the balance of power that the dissent surmises.

and removal of [board, commission, or other body] members shall be as provided by law.").

## B. The Legislative History and Structure of HRS §§ 26-34 and 269-2 Indicate Holdover Commissioners Serve in an Acting Capacity that Does Not Preclude a Vacancy

We now turn to HRS §§ 26-34 and 269-2 to determine whether the legislature intended the holdover provisions to prevent the governor from exercising the interim appointment power upon the expiration of a commissioner's term--a result that, as discussed, would be constitutionally suspect. Based on the structure and legislative history of the statutes, we conclude that holdover members of commissions serve in an acting capacity, leaving the office of in-term commissioner vacant for purposes of the governor's interim appointment power.

### 1. The Language and Structure of Statutes Governing Board Appointments Suggest Holdovers Serve in an Acting Capacity

There are textual and structural indications in the statutes governing the appointment of PUC commissioners that holdover members serve in an acting capacity that does not preclude a vacancy. HRS § 269-2(a) specifies that a PUC commissioner "shall hold office until the member's successor is appointed and qualified."[21] Notably, the provision makes no

_____

[21] Although this court has stated that "where a statute contains the word 'shall,' the provision generally will be construed as mandatory," Malahoff v. Saito, 111 Hawai'i 168, 191, 140 P.3d 401, 424 (2006), we have also long held that "this court may depart from a plain reading of a statute

(continued . . .)

mention of senate confirmation, but instead conditions the end of a holdover members service on "appoint[ment] and qualif[ication]."  This is significant because appointment occurs both in the normal senate confirmation process and when the interim appointment power is exercised.  See Haw. Const. art. V, § 6 ("When the senate is not in session and a vacancy occurs in any office, appointment to which requires the confirmation of the senate, the governor may fill the office by granting a commission which shall expire, unless such appointment is confirmed . . . ." (emphasis added); id. ("The governor shall nominate and, by and with the advice and consent of the senate, appoint all officers for whose election or appointment provision is not otherwise provided for by this constitution or by law." (emphasis added)).

By contrast, the holdover provisions applicable to members of the Board of Education and the Board of Regents for the University of Hawai'i--for which article X, sections 2 and 6 specify that the governor's appointment authority shall be "as provided by law"--both clearly state that "[e]very member may

_____

(. . . continued)

where a literal interpretation would lead to absurd and/or unjust results." Iddings v. Mee-Lee, 82 Hawai'i 1, 15, 919 P.2d 263, 277 (1996).  It is self-evident that a commissioner may not be made to hold office against the commissioner's will, see U.S. Const. amend. XIII, and we do not believe the legislature would provide a holdover commissioner with more protections from removal than an in-term commissioner.

serve beyond the expiration date of the member's term of appointment until the member's successor has been appointed by the governor <u>and confirmed by the senate</u>."  HRS §§ 302A-123(d) (Supp. 2018), 304A-104(a) (2007) (emphasis added).[22]  That the legislature chose to use the term "appointed" rather than "confirmed" in HRS § 269-2(a) suggests a holdover's service may be ended through either a full-term appointment <u>or</u> an interim appointment--the latter of which would occur only if the office of in-term PUC commissioner is vacant upon the expiration of a commissioner's term.  <u>See</u> <u>Agustin v. Dan Ostrow Const. Co.</u>, 64 Haw. 80, 83, 636 P.2d 1348, 1351 ("[D]ifferent words in a statute are presumed to have different meanings.").  Thus, the text of HRS § 269-2(a)'s holdover provision suggests that a holdover commissioner does not occupy the office of in-term commissioner, but rather serves in an acting capacity that does not prevent a vacancy from arising.

The dissent contends that our interpretation of the word "qualified" in HRS § 269-2(a) should encompass senate confirmation.  Dissent at 19.  According to the dissent, our interpretation should be controlled by the language of the Organic Act, which established the Territory of Hawai'i.  <u>Id.</u>;

---

[22]  HRS § 304A-104(a) was amended in 2019.  Act 172 (June 27, 2019). These amendments do not affect our analysis.

Organic Act of April 30, 1900, ch. 339, 31 Stat. 141. The Organic Act uses "appointed and qualified" to mean appointed by the governor and confirmed by the senate, asserts the dissent. Dissent at 19-20. Thus, the dissent theorizes that the Act was the origin of the language used in the PUC holdover provision and the general holdover provision, and it therefore concludes that the language from the Organic Act should control. Id. at 10-11.

Notwithstanding the uncertainty as to the origins of the language used in HRS §§ 269-2(a) or 26-34, upon inspection, there is no indication that the language of the Organic Act conflates "qualification" with "confirmation." See 31 Stat. 141, 156-157. Rather, within the very same section referenced by the dissent, the Organic Act uses the term "confirmed" in one sentence and the term "qualified" in another.[23] Id. There is no

---

[23] Section 80 of the Organic Act, which governs the appointment, removal, tenure, and salaries of officers states in relevant part as follows:

> [T]he governor shall nominate and, by and with the advice and consent of the senate of the Territory of Hawaii, appoint the attorney-general, treasurer, . . . and any other boards of a public character that may be created by law; and he may make such appointments when the senate is not in session by granting commissions, which shall, unless such appointments are confirmed, expire at the end of the next session of the senate. He may, by and with the advice and consent of the senate of the Territory of Hawaii, remove from office any of such officers. All such officers shall hold office for four years and until their successors are appointed and qualified, unless sooner removed, except the commissioners of public instruction and the members of

(continued . . .)

evidence overcoming the presumption that Congress intended these "different words . . . to have different meanings."[24] Agustin, 64 Haw. at 83, 636 P.2d at 1351.

Additionally, with the exception of HRS § 26-34(c)'s procedure for filling vacancies that arise from a death, resignation, or removal that takes place during a commissioner's term, neither HRS § 26-34 nor HRS § 269-2 explicitly specifies when the governor shall appoint new board and commission members. The statutes state that board members shall be appointed to terms of a specific number of years, however, implying that members may be replaced following the expiration of this period.[25] Some qualitative difference exists, then,

---

(. . . continued)

> said boards, whose terms of office shall be as provided by
> the laws of the Territory of Hawaii.

31 Stat. 141, 156 (emphases added).

[24] Morita, similar to the dissent, argues that the term "qualified" in HRS § 269-2(a) means fulfilling all legal requirements to take office, which she maintains include senate confirmation. Senate confirmation is not a legal requirement for an interim appointee to take office, however. As stated, when the interim appointment power is used, an individual takes office before senate confirmation occurs. Thus, an official is qualified once an interim appointment has occurred and the oath of office has been administered provided the individual satisfies all other requirements for the office. See, e.g., HRS § 269-2(a) (requiring that PUC commissioners have "experience in accounting, business, engineering, government, finance, law, or other similar fields" and prohibiting commissioners from holding other office or employment and from owning stock in a public utility).

[25] As related above, HRS § 26-34(a) states in relevant part, "Unless otherwise provided by this chapter or by law hereafter enacted, the terms of the members shall be for four years[.]" HRS § 269-2(a) provides in relevant part, "All members shall be appointed for terms of six years each[.]"

between a member's in-term service--during which the member cannot be replaced absent death, resignation, or removal from office--and a member's out-of-term holdover service, during which a successor may be appointed. The distinction may be attributed to holdover members serving in an acting capacity, leaving the office of the in-term commission member vacant and available for appointment. This reading is further supported by the legislative history that is available from the enactment of the holdover provisions appearing in HRS §§ 26-34(b) and 269-2(a).

### 2. The "Acting Capacity" Interpretation of HRS §§ 269-2 and 26-34 is Consistent with Indications of Legislative Intent

Legislative history gives us limited insight into the intended interaction of the statutory holdover provisions and the governor's interim appointment power. The standing committee and conference reports from when the legislature enacted the 1976 legislation that added the holdover provision for the PUC to HRS § 269-2(a) made no mention of the clause as it relates to interim appointments (nor indeed did it reference the holdover provision at all). See Conf. Comm. Rep. No. 46, in 1976 Senate Journal, at 895-96, 1976 House Journal, at 1155-56; S. Stand. Comm. Rep. No. 513, in 1976 Senate Journal, at 1104-06; S. Stand. Comm. Rep. No. 654, in 1976 Senate Journal, at

1172-74; H. Stand. Comm. Rep. No. 334, in 1976 House Journal, at 1424-26.

However, the 1984 committee reports from when the legislature added the similar holdover provision applicable to all members of commissions or boards to HRS § 26-34 indicate that the addition was made for largely administrative purposes. See S. Stand. Comm. Rep. No. 1725, in 1984 Senate Journal, at 1087; H. Stand. Comm. Rep. No. 604, in 1984 House Journal, at 1148.  The House of Representatives standing committee report states that the change was based on testimony from the State Planning Council on Developmental Disabilities indicating that logistical problems arose when less than a full complement of commission members were available.  H. Stand. Comm. Rep. No. 604, in 1984 House Journal, at 1148.  The apparent implication of the testimony is that certain commissions experienced difficulties fulfilling their duties when a vacancy occurred and the governor did not exercise appointment authority, as such problems would not arise when the governor acted promptly to fill a vacancy.  This would indicate that the holdover provisions are meant to address situations in which the governor

has not acted to fill a vacancy, and they are not meant to prevent the governor from making such an appointment.[26]

There is no suggestion in the history of the two statutes that the legislature intended the 1976 or 1982 legislation to limit the governor's interim appointment power, and, indeed, it is doubtful that the governor would have signed the respective bills if the governor believed the statutes diminished executive authority in this regard. This court will not read such a sweeping rebalancing of power in what appears to be a minor administrative accommodation. See Whitman v. Am. Trucking Assocs., 531 U.S. 457, 468 (2001) (noting that legislatures do not "hide elephants in mouseholes").

Indeed, when considering a nearly directly analogous situation, the U.S. Court of Appeals for the D.C. Circuit

---

[26] The dissent claims this infringement of the governor's interim appoint power was precisely the purpose of the holdover provisions and cites the governor's practice of nominating prospective board and commission members for service during the legislative sessions preceding the commencement of their terms in office as evidence that holdover provisions preclude the governor from making an interim appointment. Dissent at 8. The fact that the governor generally nominates prospective board and commission members in this manner does not limit or define the governor's interim appointment power. Indeed, the governor has duly exercised the interim appointment power to fill a position after the natural expiration of the preceding holder's term in various circumstances. See Press Release, Hawai'i Governor's Office, Governor Appoints 3 Members to Board of Land and Natural Resources, (July 11, 2014) https://dlnr.hawaii.gov/wp-content/uploads /2012/12/GOV-NR-BLNR-Appointments-7-11-14.pdf [https://perma.cc/69DL-TVWF]; Press Release, Hawai'i Governor's Office, Governor appoints Edmund (Fred) Hyun as interim chair of the Hawai'i Paroling Authority, (Sept. 6, 2016) https://governor.hawaii.gov/newsroom/governors-office-news-release-governor-appoints-edmund-fred-hyun-as-interim-chair-of-the-hawaii-paroling-authority/ [https://perma.cc/3U64-WDXF].

declined to adopt such a reading of a statutory holdover provision in the organic act of the National Credit Union Administration (NCUA) because the legislative history suggested the clause was intended for the same administrative purposes involved here. Swan v. Clinton, 100 F.3d 973, 985–86 (D.C. Cir. 1996). In concluding that it was unnecessary to determine whether a vacancy existed because the holdover board member no longer enjoyed protections against removal by the president following the expiration of the member's enumerated term, the D.C. Circuit relied in part on the lack of obvious legislative intent to curtail the president's constitutional authority:

> Removal protection for holdover members might be necessary if the purpose of the holdover clause were not just to prevent gaps in agency leadership generally, but more specifically to prevent gaps from occurring during the time it takes the Senate to confirm a successor--in other words, if the purpose of the holdover clause was to prevent a successor from being appointed via the recess appointment clause. But there is no indication in the language of the NCUA statute or the legislative history of the 1978 amendments that Congress intended the holdover clause to serve any such purpose of precluding recess appointments. Cf. Staebler [v. Carter], 464 F.Supp. [585,] 592 [(D.D.C. 1979)] (although several congressional reports describe holdover clauses as allowing the Senate an opportunity to confirm successor officials, "in none of these reports is there any indication that the Committees considered, much less that they intended to rule out, the constitutionally-prescribed recess appointment option"). And we are unwilling to infer that the NCUA statute precludes the President from exercising a constitutionally granted power absent clear evidence that this was Congress' intent.

Id. (emphases added).

Similarly, in Staebler v. Carter, the U.S. District Court for the District of Columbia considered whether a holdover provision of the Federal Elections Campaign Act, 2 U.S.C.

38

§ 437c(a)(2)(B), prevented the president from making an appointment pursuant to the constitutional recess appointment power following the expiration of a federal election commissioner's enumerated term. 464 F.Supp. at 588. As here, the plaintiff argued that a vacancy did not arise upon the expiration of the enumerated term and that a replacement could be "appointed only through nomination by the President and confirmation by the Senate." Id. at 589. In rejecting this argument, the court observed that

> there is no basis either in the language of the statute or in its legislative history to support the conclusion that Congress meant to rein in the President in such an unprecedented manner. In the absence of a clearly-expressed legislative intent, the Court will not speculate that the Congress sought to achieve a result which would be both unusual and probably beyond its constitutional power.

Id. at 591. Thus, the district court found no reason to interpret the holdover statute in a way that precluded a vacancy--which would result in serious questions about its constitutionality--because the legislature did not evince any manifest intention to limit the executive's interim appointment authority. See also id. at 592 ("The Court finds it difficult to believe that, had the Congress intended to take the significant step of attempting to curtail the President's constitutional recess appointment power, or even to legislate in the area of that power, it would not have considered the matter

with more deliberation or failed to declare its purpose with greater directness and precision.").

Just as in Swan and Staebler, here "there is no indication in the language . . . or the legislative history" of HRS § 269-2(a) that the legislature "intended the holdover clause to serve any such purpose of precluding recess appointments."  Swan, 100 F.3d at 985-86.  This court is likewise "unwilling to infer that the . . . statute precludes the [governor] from exercising a constitutionally granted power absent clear evidence that this was [the legislature's] intent."[27]  Id.

## IV. CONCLUSION

In sum, the language, structure, and legislative history of the holdover provisions in HRS §§ 26-34(b) and 269-2(a) do not evince an intention to limit the governor's authority to make interim appointments upon the expiration of a PUC commisioner's term if the senate is not in session, and the statutes would be highly suspect as a constitutional matter if they sought to achieve this outcome.  We therefore hold that a

---

[27]   It is noted that the Senate unanimously confirmed Gorak's successor, James P. Griffin, who was also appointed by Governor Ige pursuant to the interim appointment power.  If no vacancy existed at the time Governor Ige appointed Gorak, it would follow that no vacancy existed at the time Governor Ige appointed Griffin because Champley, Gorak's predecessor, neither relinquished office nor reached either of the statutory limits that may be applicable to the length of his holdover service.  See supra note 19.  It is also noted that the Senate did not participate in this appeal.

vacancy existed upon the expiration of Champley's term as PUC commissioner, and Governor Ige was thus entitled to appoint Gorak on an interim basis pursuant to article V, section 6 of the Hawai'i Constitution.[28]  Accordingly, the judgment of the circuit court is affirmed.

| Harold Bronstein | /s/ Paula A. Nakayama |
| for appellant | |
| | /s/ Sabrina S. McKenna |
| Deirdre Marie-Iha | |
| for appellee | /s/ Richard W. Pollack |
| | /s/ Michael D. Wilson |



---

[28]  Given this disposition, we need not address the circuit court's dismissal of Morita's claim for declaratory relief based on a lack of standing.